IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| GREATER YELLOWSTONE COALITION, *et al.*, | ) ) | |
| Plaintiffs, | ) ) | Case No. CV-08-388-E-MHW |
| v. | ) ) | **ORDER** |
| LAWRENCE TIMCHAK, Supervisor, Caribou-Targhee National Forest, in his official capacity, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) | |
| and | ) ) | |
| J.R. SIMPLOT COMPANY, | ) ) | |
| Intervenor-Defendant, | ) ) | |
| and | ) ) | |
| UNITED STEELWORKERS LOCAL 632, | ) ) | |
| Intervenor-Defendant, | ) ) | |
| and | ) ) | |
| CITY OF POCATELLO, CITY OF CHUBBUCK, CITY OF SODA SPRINGS, POWER COUNTY, CARIBOU COUNTY, and BANNOCK COUNTY, | ) ) ) ) | |
| Intervenor-Defendants, | ) ) | |
| and | ) | |

**Order - 1**

|                                        |     |
| -------------------------------------- | --- |
| IDAHO FARM BUREAU FEDERATION,          | )   |
|                                        | )   |
|      Intervenor-Defendants,            | )   |
|                                        | )   |
| and                                    | )   |
|                                        | )   |
| TOWN OF AFTON, WYOMING and             | )   |
| LINCOLN COUNTY, WYOMING,               | )   |
|                                        | )   |
|      Intervenor-Defendants.            | )   |

Pending before the Court is Plaintiffs' Motion for Preliminary Injunction (Docket No. 18) which is opposed by the Federal Defendants and all Intervenor-Defendants.  Having carefully reviewed the record, considered the briefing and oral arguments of all parties, and being otherwise fully informed, the Court enters the following Order denying the motion for the reasons set forth below.

## PROCEDURAL STATUS

Greater Yellowstone Coalition ("GYC"), Natural Resources Defense Council ("NRDC"), Sierra Club, and Defenders of Wildlife ("Defenders") (collectively, "Plaintiffs") are organizations, as relevant here, dedicated to preservation of the lands, waters, and wildlife of southeastern Idaho.  They claim that new phosphate mining activity in the Caribou-Targhee National Forest (the "Forest") accompanying the planned expansion of the Smoky Canyon Mine owned by Intervenor-Defendant J .R. Simplot Company ("Simplot") was authorized following an inadequate environmental analysis.  They further claim that the expansion will result in irreparable harm to the environment in several ways, most importantly in the form of increased selenium contamination to the adjacent watershed, and will adversely impact their members'

Order - 2

enjoyment of recreational, aesthetic, and conservation interests within the Forest.

Plaintiffs seek declaratory and injunctive relief against the United States Forest Service ("Forest Service") and Bureau of Land Management ("BLM") (collectively, the "Agencies" or "Federal Defendants") pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq*. ("APA"); the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.* ("CWA"); the National Forest Management Act, 16 U.S.C. §§ 1600 *et seq.* ("NFMA"); the Mineral Leasing Act, 30 U.S.C. §§ 181 *et seq.* ("MLA"); the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA"); and the Roadless Area Conservation Rule, 36 C.F.R. § 294.10, *et seq*. ("RACR"). Plaintiffs request that the Court set aside the Agencies' Final Environmental Impact Statement (FEIS) and Records of Decision (RODs) and preliminarily and permanently enjoin the Agencies from authorizing implementation of the mine expansion pending compliance with federal law.

Simplot's participation in this proceeding was anticipated and unopposed, and the Court granted its Motion to Intervene based on its brief. *See Order* (Docket No. 82). Various Idaho and Wyoming cities and counties, United Steelworkers Local 632, and the Idaho Farm Bureau Association (collectively, "Intervenor-Defendants") also filed Motions to Intervene as Defendants which were opposed by Plaintiffs[1]. The Court granted their respective motions after reviewing the briefing and hearing oral argument. *See Order* (Docket No. 97).

## BACKGROUND

### A.    History of Phosphate Mining[2]

In the 1870s, prospectors staked mining claims in southeastern Idaho and dug numerous

---

[1]    Although Simplot is also an Intervenor-Defendant, the Court will refer to Simplot by name and all other intervenors collectively as Intervenor-Defendants.

[2]    This information is taken from *A History of Phosphate Mining in Southeastern Idaho* (Barker Dec. Ex. C) (Docket No. 60-4).

pits and tunnels searching for copper, gold, or silver.  At times, this prospecting activity occurred in areas containing phosphate rock.  In the early 1900s, various individuals and groups started to recognize the potential value of some of these old mining claims, not for gold or silver, but for phosphate which could be used to produce fertilizer.

In 1908 and 1909, pursuant to a number of Secretarial Orders, the Secretary of the Interior withdrew from entry over 5 million acres of public lands in the West containing phosphate.  Almost half of those lands were later restored.

In 1910, President Taft signed into effect the Pickett Act which gave the executive branch the power to withdraw public lands to protect phosphate reserves from foreign acquisition and to ensure that the United States would not be dependent on European countries for phosphate.  Under the Act, the government withdrew approximately 2,500,000 acres in Idaho, Wyoming, and Utah that had formerly been temporarily withdrawn by the Secretary of Interior and designated them as the Western Phosphate Reserve.[3]  The courts' and Congress' efforts to establish a method of patenting phosphate claims over the next few years culminated in the passage of the Mineral Leasing Act ("MLA") in 1920.  Under the MLA, phosphate was removed from the jurisdiction of the Mining Act of 1872, and a royalty system was established to provide income to the federal government.  Since the enactment of the MLA, access to the phosphate reserves is available only through a competitive leasing process.  The United States designated certain Known Phosphate Lease Areas ("KPLA") in the Caribou-Targhee National Forest which are subject to that leasing process.

Pursuant to the MLA, the BLM administers 84 phosphate mineral leases on 46,000 acres

---

[3] Southeastern Idaho's portion of the phosphate reserves covers over 500,000 acres.  FEIS 5-1.

**Order - 4**

of land in southeastern Idaho, some of which are held by Simplot.  The BLM cooperates with the Forest Service, Idaho Department of Environmental Quality ("IDEQ"), and other state and federal agencies in evaluating and mitigating any adverse environmental consequences of phosphate mining.

**B.**     **Selenium Contamination[4]**

Phosphate is mined from open pits.  First, dirt, rock, and other material is removed from the site to expose the phosphate ore.  This material is otherwise known as overburden.  When a pit is mined out, it is backfilled with the overburden and reclaimed.  Excess overburden is disposed of in sites adjacent to the mine pits and also reclaimed.  Prior reclamation practices called for planting new vegetation directly into the overburden.

Phosphate in the southeastern Idaho area contains selenium which in small quantities is a necessary nutrient in plant and animal life.  A problem arises, however, when the overburden from phosphate mining is exposed to the elements causing the selenium to concentrate and become toxic.  Precipitation falling on the seleniferous waste causes infiltration into the groundwater or runoff into the ground or nearby streams.

In 1996, toxic amounts of selenium were discovered in some of the waters in southeastern Idaho, near the phosphate mines, after numerous livestock deaths occurred and abnormalities in aquatic life were noted.  The source of the selenium contamination was determined to be water percolating through the mines' overburden into the groundwater, draining into surface water, or being absorbed by vegetation.  Animals ingesting vegetation growing out of the overburden areas or being irrigated by contaminated water necessarily

---

[4]   This information is taken from *Response to Selenium Contamination at Phosphate Mines in Southeastern Idaho* (Barker Dec. Ex. F) (Docket No. 60-7) unless otherwise noted.

**Order - 5**

ingested concentrated amounts of selenium. These incidents occurred in a separate drainage from the one in which Simplot's Mine is located.   FEIS 2-17; 5-26.

Once the selenium problem was discovered, five phosphate mining companies in southeastern Idaho, including Simplot, formed an ad hoc committee of the Idaho Mining Association and collaborated with representatives from various state and federal agencies to form the Selenium Working Group to identify the sources of the selenium contamination and to work towards mitigation of past selenium contamination and prevention of future selenium contamination.[5]  The Selenium Working Group eventually evolved into the Selenium Steering Committee which, with its consultant, performed several investigations and generated numerous reports.  Other organizations were conducting separate studies during this time.  One such study, funded by Simplot, was conducted by the University of Idaho specifically to identify or refine environmental and selenium treatments at the Smoky Canyon Mine.

In 2000, the voluntary effort of the Selenium Working Group, primarily controlled by the mining companies on the Selenium Subcommittee, was replaced by a Memorandum of Understanding concerning Contamination from Phosphate Mining Operations in Southeastern Idaho ("MOU") entered into by federal regulatory agencies (USFS, BLM, EPA, USFWS, and BIA), the IDEQ, and the Shoshone-Bannock Tribes.  The MOU placed control of addressing the selenium problem on the regulatory agencies under the Comprehensive Environmental

---

[5]  The agencies initially included the Forest Service, the BLM, IDEQ, the Idaho Department of Lands ("IDL"), and the Idaho Department of Fish and Game ("IDFG").  Subsequently, others joined the process but were not part of the Selenium Working Group.  They are the U.S. Fish and Wildlife Service (USFWS), the U.S. Environmental Protection Agency ("EPA"), U.S. Bureau of Indian Affairs, and Shoshone-Bannock Tribes. Representatives of the public, local environmental interest groups, academic community, veterinary and agricultural sciences, and the press also participated in the Working Group's open meetings.  Ultimately, a smaller "Selenium Steering Committee" was formed consisting of a single responsible representative from each organization within the Selenium Working Group.

Response, Compensation, and Liability Act ("CERCLA").  The mining companies embraced this change in management and entered into an enforceable Area-wide Consent Order and Administrative Order on Consent (CO/AOC).

Site specific investigations by the appropriate lead agency as set forth in the MOU were to follow.  Towards that end, in 2003, Simplot entered into a CERCLA Administrative Order of Consent to conduct a Site Investigation ("SI") and Engineering Evaluation/Cost Analysis ("EE/CA") pertaining to Smoky Canyon Mine.  *Barker Dec.* Ex. G. (Docket No. 60-8). Numerous studies, site investigations, and evaluations followed, including geochemistry studies; groundwater and surface water resource studies; wildlife surveys; wetlands field investigations; geological explorations; vegetation surveys; soil inventories; cultural resource surveys; fisheries/aquatic resource sampling; and over 30 agency field visits exclusive of visits by agency personnel, non-government organizations, and interested citizens.  *Declaration of Lori Hamann* ("Hamann Dec.") (Docket No. 58).

## C.      Simplot's Mining Operation

Pursuant to the MLA, Simplot leases Caribou National Forest KPLA land on which its Smoky Canyon Mine (the "Mine") is located.  The Mine is ten miles west of Afton, Wyoming, and 110 miles south of Yellowstone National Park.

Simplot commenced this phosphate mining operation in 1983.  It consists of several sections known as Panels A, B, C, D, and E, the mining of which was authorized by the Forest Service and BLM at various times from 1982 through 2002.  After the phosphate is mined, the ore is converted on site into a liquid slurry which is transported through a buried pipeline to Simplot's Don Fertilizer Plant ("Don Plant" or "Plant") near Pocatello, Idaho, a distance of over 80 miles, where it is processed into fertilizer.  The Mine has been the sole supplier of phosphate

to the Don Plant since Simplot developed the pipeline system and discontinued dry handling of phosphate ore in the 1990s. *Declaration of William J. Whitacre* ¶ 4 ("*Whitacre Dec.*") (Docket No. 12); *Declaration of Martin Hunt* ¶ 9 (Docket No. 85). At that time, Simplot "retired and abandoned any facilities to transport, receive or utilize non-slurried ore at the Don Plant." *Whitacre Dec.* ¶ 4.

In April 2003, having exhausted supplies of phosphate in all but one of its previously approved panels, Simplot submitted a Mining and Reclamation Plan ("Mining Plan") to the Agencies seeking authorization to expand its mining operations into adjacent Panel F, initially leased in 2001, and Panel G, initially leased in 1951, to ensure an uninterrupted supply of phosphate for the Don Plant. Without expansion, the Mine will have exhausted its existing reserves by mid-summer of 2010. *Declaration of Dennis L. Facer* ("*Facer Dec.*") ¶ 3 (Docket No. 11).

 In order to limit selenium contamination, the Mining Plan proposed that the Mine's overburden would be covered with a cover of chert[6] and topsoil. FEIS 2-49. Simplot submitted that the cover would store and remove precipitation from the overburden piles through runoff, evaporation, and plant transpiration, thereby preventing selenium from percolating through the overburden to the groundwater, surface water, or ground.

## D.    Agencies' Action

In September, 2003, in response to Simplot's proposed Mining Plan, the Forest Service and BLM issued a scoping letter regarding the need for an environmental impact statement for

---

[6]  The term "chert" as used in the FEIS "refers to overburden with a low selenium concentration and can include chert, cherty limestone, and limestone." FEIS at 2-37.

**Order - 8**

Smoky Canyon Mine Panels F and G.[7]  The scoping letter was followed by two public meetings.

Two years later, in December 2005, the Agencies issued a draft environmental impact statement

("DEIS") for comment.  The DEIS determined that the cover design proposed by Simplot to

prevent selenium contamination was inadequate and recommended what was termed

"Alternative B."  That alternative "would have eliminated all selenium overburden fills external

to the pit boundaries."  FEIS 2-107.

　　　　As more thoroughly described below, Simplot thereafter went through a significant

amount of study and refinement of its cover design.  Two years later, on October 26, 2007, the

final environmental impact statement ("FEIS") was made available for public review and

comment.  The FEIS adopted the use of a new and improved cover design that would use topsoil,

Dinwoody material and chert instead of the shingle-type infiltration barrier addressed in the

DEIS.  FEIS 2-50.  In effect, the FEIS chose the previously rejected Alternative D as the

preferred alternative for the Mine expansion after concluding, based on computer modeling and

other studies, that the new cover design would result in selenium levels well below the Idaho

water quality standard.  Then, on June 6, 2008, the Agencies issued their respective Records of

Decision ("RODs") approving the expansion into Panel F and Panel G.  Each of these panels is

located in areas prescribed by the Forest Service for phosphate mining.

　　　　Plaintiffs, who had commented throughout the approval process, appealed the Forest

Service ROD.  The appeal was denied on September 25, 2008.  There was no procedure for

administratively appealing the BLM ROD.  After providing the Forest Service and BLM a 60-

---

[7]  Because the mining leases are administered by the BLM and the leases are located on Caribou-National Forest land administered by the Forest Service both agencies participated in the review of the proposed expansion and ultimate preparation of the FEIS as lead and co-lead agencies, respectively.  BLM ROD at 1. However, the Agencies prepared separate RODs.  The IDEQ participated in the preparation of the DEIS and FEIS as a cooperating agency.  *Id*. at 2.

days' notice of intent to sue under the Clean Water Act, Plaintiffs filed this action seeking declaratory and injunctive relief.

**E.      Complaint**

Plaintiffs contend the Agencies: (1) violated the CWA by (a) arbitrarily declaring that an expansion of the Smoky Canyon Mine will not result in further violations of Idaho's water quality standards, and (b) authorizing an expansion of the Smoky Canyon Mine in the absence of a section 401 certification from the state of Idaho; (2) violated the NFMA by (a) arbitrarily declaring that an expansion of the Smoky Canyon Mine will not result in violations of forest plan standards requiring protection of water quality, and (b) failing to designate and monitor management indicator species and to assess the impacts of the Smoky Canyon Mine expansion on those species; (3) violated the MLA and BLM regulations by failing to assess the value of the north and south lease modification areas' phosphate deposits in light of the substantial costs of remediating the mine; (4) violated RACR by authorizing an expansion of the mine and related road-building activities within the Sage Creek and Meade Peak inventoried roadless areas; and (5) violated NEPA by (a) failing to take a "hard look" at the impacts of expanding the mine and the consistency of the expansion with governing legal mandates, (b) failing to prepare a supplemental environmental impact statement, (c) failing to adequately define and assess available mitigation measures, (d) relying on incomplete and inaccurate information, (e) disregarding unfavorable information and critical uncertainties, and (f) otherwise failing to ensure the integrity of the Agencies' environmental analysis.

Of the various grounds advanced in their Complaint, Plaintiffs limit their preliminary injunction motion to the likelihood of prevailing on the CWA, NFMA, and NEPA claims.  They further limit their arguments to the Agencies' alleged arbitrary reliance on Simplot's "untested"

store and release cover design, their alleged arbitrary reliance on the success of Simplot's

"uncertain" remediation efforts, and several related alleged NEPA violations.  Plaintiffs further

contend that an injunction is necessary to protect the land, waters, and wildlife of the Caribou-

Targhee National Forest.

## PRELIMINARY INJUNCTION

### A.      Standard of Law

The Ninth Circuit, in an en banc decision, recently took the opportunity to "clarify some

of [its] environmental jurisprudence" regarding review of the actions of the United States Forest

Service.  *Lands Council v. McNair*, 537 F.3d 981, 984 (9th Cir. 2008) (en banc).  In doing so, it

reiterated that a preliminary injunction is appropriate when the party seeking the injunction

demonstrates "either (1) a likelihood of success on the merits and the possibility of irreparable

injury; or (2) that serious questions going to the merits were raised and the balance of hardships

tips sharply in [the plaintiff's] favor." *Id.* at 1003 (internal quotations omitted).  Stated another

way, the Ninth Circuit standards "represent extremes of a single continuum: 'the less certain the

district court is of the likelihood of success on the merits, the more plaintiffs must convince the

district court that the public interest and balance of hardships tip in their favor.'" *Id.* at 987

(citation and internal quotations omitted).  The parties here have all used the same standard when

arguing for and against the preliminary injunction.  However, it appears that a portion of that

standard is no longer appropriate.

On November 12, 2008, a week after the hearing on the preliminary injunction motion,

the Supreme Court, although not citing *McNair* specifically, criticized the portion of the Ninth

Circuit's standard that allows a preliminary injunction to be entered based only on the

"possibility" of irreparable harm:

**Order - 11**

> We agree with the Navy that the Ninth Circuit's "*possibility*"
> standard is too lenient. Our frequently reiterated standard requires
> plaintiffs seeking preliminary relief to demonstrate that irreparable
> injury is *likely* in the absence of an injunction. . . .  Issuing a
> preliminary injunction based only on a *possibility* of irreparable
> harm is inconsistent with our characterization of injunctive relief
> as an extraordinary remedy that may only be awarded upon a clear
> showing that the plaintiff is entitled to such relief.

*Winter v. Natural Resources Defense Council*, 2008 WL 4862464 at *10 (Sup. Ct. Nov. 12,

2008) (citations omitted) (emphasis added).  The Supreme Court noted that the incorrect

standard may not have affected the Ninth Circuit's decision affirming the district court's

decision since it found a "near certainty" of irreparable harm.  *Id.*  Nevertheless, judicial

prudence would dictate modifying the *McNair* standard to require that a plaintiff demonstrate

that irreparable harm is *likely* rather than a mere *possibility*.

In any event, the burden of persuasion is on the plaintiff to show entitlement to a

preliminary injunction.  *McNair*, 537 F.3d at 1003.  If there is only a small likelihood of success

on the merits but there are serious questions going to the merits, the court must not only balance

the hardships but also take into consideration the public interest in the issues raised when

determining in whose favor the balance of hardships tips.  *Id.* at 1003-04.  *See also Kootenai*

*Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1125 (9th Cir. 2002).  The public interest involves

not only preservation of environmental resources, but also factors such as the impact on the local

economy.  *McNair*, 537 F.3d at 1005.[8]

It is important to keep in mind in a preliminary junction proceeding that a "district

---

[8]  The Court notes that the Supreme Court in *Winter* articulates its preliminary injunction standard without
reference to any kind of "continuum."  It states that "[a] plaintiff seeking a preliminary injunction must establish that
he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief,
that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter* at *9.  While
worded somewhat differently, with the correction to require that irreparable harm is "likely," the standards are
sufficiently similar.  The Court reaches the same conclusion under either standard.

court's decision is preliminary. . . . [i]t is not on the merits" given that the district court has "to act with some dispatch."  *Sierra Forest Legacy v. Rey*, 526 F.3d 1228, 1231 (9th Cir. 2008).

**B.      Standard of Review under the APA**

In determining whether a preliminary injunction should issue in actions brought under NEPA, CWA, or NFMA, the court must view the likelihood of success on the merits against the narrow APA standard which dictates that a reviewing court may set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  *See also McNair*, 537 F.3d at 987 (NEPA and NFMA); *North Idaho Community Action Network v. U.S. Dept. of Transportation*, 2008 WL 4459073 at *2 (9th Cir. Oct. 6, 2008) (NEPA); *Swanson v. U.S. Forest Service*, 87 F.3d 339, 345 (9th Cir. 1996) (CWA). The court "will reverse a decision as arbitrary or capricious only if the agency relied on factors Congress did not intend it to consider, 'entirely failed to consider an important aspect of the problem,' or offered an explanation 'that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *McNair*, 537 F.3d at 987 (citation omitted).

In making that determination, the court must not assume the role of a scientist and need not agree with the agency's decision.  *Id.* at 988.  Rather, agencies have the discretion to rely on its own experts' reasonable opinions to resolve a conflict between or among specialists.  *Marsh v. Oregon Nat. Resources Council*, 490 U.S. 360, 378 (1989); *McNair,* 537 F.3d at 1000.

## SUMMARY OF STATUTORY CLAIMS

As noted, Plaintiffs argue their likelihood of succeeding on the merits under three different statutes as a basis for entry of a preliminary injunction.  However, the claims under each statute essentially involve the same challenges to the Agencies' decisions on the cover

design and the remediation efforts referred to above.  If Plaintiffs show a likelihood of

succeeding under NEPA, it would necessarily follow that they would make the same showing

under the CWA and NFMA.  Nevertheless, the Court will briefly review each statute and state

Plaintiffs' position with respect to each.

## A.   NEPA

NEPA has been described as "our basic national charter for protection of the

environment."  *North Idaho Community Action Network v. United States Department of*

*Transportation*, 2008 WL 4459073 at *2 (9th Cir. Oct. 6, 2008) (citing *Ctr. for Biological*

*Diversity*, *v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008)).  NEPA

requires agencies to have available and carefully consider "'detailed information concerning

significant environmental impacts' and make that information available to the public."  *Id*.

(citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)).  Stated another

way, NEPA requires a federal agency to "'consider every significant aspect of the environmental

impact of a proposed action . . . [and] inform the public that it has indeed considered

environmental concerns in its decisionmaking process.' . . .   In order to accomplish this, NEPA

imposes procedural requirements designed to force agencies to take a 'hard look' at

environmental consequences."  *Earth Island Institute v. U.S. Forest Service*, 351 F.3d 1291,

1300 (9th Cir. 2003) (internal citations omitted).  NEPA "exists to ensure a process" as opposed

to imposing substantive requirements on federal agencies.  *McNair*, 537 F.3d at 1000 (citation

omitted).  *See also Winter* at *11.

Procedural requirements under NEPA and its regulations include a scoping process to

determine whether an environmental impact statement is necessary, scientific analysis, expert

agency comments, public involvement, discussion of significant environmental impacts, and

**Order - 14**

information regarding reasonable alternatives to the proposed action.  *See generally* 40 C.F.R.

§§ 1500.1; 1502.1.  A DEIS must disclose and discuss all major points of view on the

environmental impact of alternatives to the proposed action as well as the proposed action itself.

40 C.F.R. § 1502.9.  A FEIS must respond to comments solicited and  received from certain

federal agencies, appropriate state and local agencies authorized to develop and enforce

environmental standards, Indian tribes where necessary, the applicant, and the public.  40 C.F.R.

§ 1503.1.  Finally, a FEIS must respond to the comments using one of the options specified in

the regulations and attach all substantive comments or summaries thereof.  40 C.F.R. § 1503.4.

Plaintiffs' contentions in their preliminary injunction motion regarding the NEPA claims

are that the Agencies acted arbitrarily by:  (1) approving the expansion of Smoky Canyon Mine

with an inadequate FEIS that failed to assess the impact of seasonal precipitation on Simplot's

store and release cover design, (2) failing to include the additional four days of modeling runs

needed to assess the cover's seasonal performance, (3) relying on a "test while mining" scheme

under which critical issues regarding the impact of Simplot's expanded operation will be

assessed as Simplot expands the Mine, (4) failing to address the uncertainty regarding the

sources of the selenium contamination currently in the nearby streams, and (5) failing to define

and assess whatever "adaptive" mitigation measures might be taken should the Smoky Canyon

Mine expansion result in increased selenium contamination.

## B.     CWA

The stated purpose of the Clean Water Act (33 U.S.C. §§ 1251 to 1376) is "to restore and

maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C.

§ 1251(a).  Under the Act, federal agencies have a duty to ensure that activities carried out on

federal land comply with state water quality standards in the same manner and to the same extent

as any nongovernmental entity.  *See* 33 U.S.C. § 1323(a).  Idaho law authorizes the IDEQ to promulgate regulations to achieve maintenance of existing beneficial uses of waters.  *Idaho Code*, § 39-3601; § 39-3603.  Those regulations appear at Idaho Administrative Code 58.01.02.001, *et seq*.

As relevant here, Idaho law prohibits discharge of pollutants that "[w]ill or can be expected to result in a violation of the water quality standards applicable to the receiving water body or downstream waters; or . . . [w]ill injure designated or existing beneficial uses. . . ." Idaho Admin. Code r. 58.01.02.080.01.  The criteria for toxic substances applicable to selenium is 0.0005 milligrams per liter expressed as 5 ug/L.  Idaho Admin. Code r. 58.01.02.210.01. Finally, for waters that are listed as impaired pursuant to § 303(d), Idaho law requires that any activity be restricted "as necessary to prohibit further impairment of . . . designated or existing beneficial uses."  Idaho Admin. Code r. 58.01.02.054.05.

In support of their CWA argument, Plaintiffs argue that the Agencies acted arbitrarily in relying on Simplot's store and release cover and on the anticipated success of the Pole Canyon remediation to determine that the Mine expansion would not further impair the § 303(d) listed streams and that the selenium level in the unimpaired surface and groundwater would remain within Idaho's water quality standards.

## C.    NFMA

For each unit in the National Forest System, NFMA requires the Forest Service to develop comprehensive management plans with which any subsequent "plans, permits, contracts, and other instruments for the use and occupancy" must be consistent.  *Earth Island Institute*, 351 F.3d at 1300 (citing 16 U.S.C. §§ 1604(a) and (i)).

The Forest Service developed the Revised Forest Plan for the Caribou National Forest

("RFP") in February 2003, a copy of which was submitted with the Complaint.  *See* Docket No.

18-9.  According to the RFP, mines are to be in compliance with applicable state and/or federal

surface and groundwater regulatory standards (RFP at 3-14 (Stnd. 1)).  Furthermore, any new

proposed management activities within watersheds containing 303(d) listed waterbodies are to

improve or maintain overall progress toward beneficial use attainment for pollutants which led to

listing (RFP 4-50 (Stnd. 1)).  Finally, phosphate mining overburden and soil materials are to be

managed according to state-of-the-art protocols to help prevent the release of hazardous

substances in excess of state and/or federal regulatory standards (RFP 4-83 (Stnd. 4)).

      Plaintiffs make the same arguments under the NFMA as they do under the CWA.   If the

Agencies have not complied with the water quality standards under the CWA, it follows that

they have not complied with the NFMA.[9]

## DISCUSSION

**A.      Likelihood of Success on the Merits**

      As stated above, in order to prevail on the merits, Plaintiffs must show that the Agencies

acted arbitrarily in authorizing expansion of the Mine.  In the FEIS, the Agencies determined

that a combination of the new cover design developed by Simplot in response to criticisms of the

design rejected in the DEIS, together with CERCLA remediation efforts already in effect at the

Mine, would result in selenium concentrations well below applicable state water quality limits.

Plaintiffs criticize those findings as "the product of unfounded assumptions, analytical shortcuts,

---

[9]   The Court notes that the RFP specifically allows for the exploration and development of existing phosphate mine leases.  *See generally* RFP Prescription 8.2.2(g) at 4-82, *et seq*.  The Guidelines to that Prescription specify that "[n]ew information from the Selenium-wide Advisory Group and other sources should be incorporated as it becomes available.  Existing plans and future proposals should be consistent with the most current science and research."  RFP at 4-84 (Guideline 1).

and irrational conclusions." *Pls.' Mem.* at 1.  They maintain that the Agencies should have

ordered further modeling of the cover design to evaluate its performance under seasonal

precipitation fluctuations, and that they should not have relied on anticipated success of

Simplot's CERCLA remediation efforts to offset selenium contamination from the Mine

expansion given that there had allegedly been little data gathered to date that the cleanup has

been effective.

More specifically, Plaintiffs contend that:  (1) the Agencies ignored the opinion of

Christopher Carlson, their own expert, that four more days of modeling should be conducted to

evaluate seasonal precipitation and runoff fluctuations and chose instead to adopt a "test by

mining approach" to the new cover design, and (2) Simplot's remediation efforts had failed once

and it is unknown whether they will work in the future.  The Court will state the parties'

respective positions on each component of their argument before stating its conclusion as the

likelihood of success on the merits.

### 1.    Store and Release Cover Design

Plaintiffs focus their argument that the Agencies acted arbitrarily in approving the cover

design on only four documents out of a "box of documents" received from the Forest Service in

response to a Freedom of Information Act ["FOIA"] request.  *See Evans Declaration* (Docket

No. 18-13) and Ex. 1 (10/19/06 e-mail from Christopher Carlson to Scott Gerwe), Ex. 2

(11/13/06 e-mail from William Albright to Scott Gerwe), Ex. 3 (1/26/07 memorandum from

Christopher Carlson to Scott Gerwe), and Ex. 4 (7/6/07 memorandum from Bill Stout, Mike

Rowe, and Jeff Jones to Larry Timchak and Joe Kraayenbrink) (Docket Nos. 18-14 through 18-

17).

Plaintiffs argue that in changing their position on the cover design concept between the

**Order - 18**

DEIS and the FEIS, the Agencies relented or capitulated to Simplot despite the negative assessment of the Forest Service's National Ground Water Program Leader, Dr. Christopher Carlson, as expressed in a January 2007 memorandum. *Evans Dec.* Ex. 3 at 1. Dr. Carlson's memorandum addressed difficulties encountered in the cover design and what he termed resulting shortcomings and shortcuts. He also recommended various conditions for field testing and monitoring. Dr. Carlson's primary concern was the failure to factor in seasonal variations of precipitation and plant transpiration in the testing model. *Id.* at 2-4.

The Agencies counter that Plaintiffs took Dr. Carlson's e-mail out of context ignoring a "full body of administrative record material" that supports their conclusions. They characterize Dr. Carlson's comments as a "difference in view," note that his concerns were considered and addressed by other members of the technical team, and maintain that the ultimate decision reflected a "proper product of agency expertise."

The technical design team consisted of members of the BLM, Forest Service, and the Idaho Department of Environmental Quality ("IDEQ"), all of whom required Simplot to demonstrate that their cover design would meet agency requirements. *See* FEIS 2-49. Simplot's design studies appear in the Simplot May 2007 Cover Design Report. *Fed. Defs' Mem.*, Ex. 2. Furthermore, the Agencies argue, extensive modeling was conducted with numerous inputs and variables regarding potential percolation. For example, the Agencies re-ran the model and verified the results, and another computer model, HELP, was run as a further check and compared with Simplot's modeling results. Also, the developer of the software used by Simplot's consultant was asked to review the results of that consultant, and he was confident of the ability of the software to function properly.

Finally, the Agencies point out that Dr. Carlson's concerns were addressed by the

technical team, and his recommendations were considered and included in the FEIS and/or BLM ROD.  Most importantly, a detailed quality assurance/quality control ("QA/QC") verification and monitoring plan was developed in response to Dr. Carlson's recommendations and with his input.  Specifically, the BLM required test plots to confirm the accuracy of the model's prediction.  The Agencies also point out that it was IDEQ, the state agency charged with protecting Idaho's waterways, that recommended that the cover design be actually tested in the field as opposed to running more computer models.

Simplot notes that intensive agency and public review of the mine expansion followed its submission of a preliminary mine operation plan on April 18, 2003.  Simplot further notes that there has been "intensive, searching, and probing" environmental analysis, including comprehensive agency and public review together with comments from the public, special-interest groups, Shoshone Bannock Tribes, and regulatory and resource management agencies. *Simplots' Mem.* at 5.  The "interdisciplinary team of technical specialists consist[ed] of 25 individuals with different areas of expertise, including geology, hydrology, water quality, engineering and fishery biology." *Id.* at 5-6.  The Agencies also contracted with an environmental consulting firm to provide outside technical expertise in a variety of critical areas as well as with with an independent expert to review the cover design and model. *Id.* at 6.  Finally, IDEQ was "intimately involved as a cooperating agency" with respect to compliance with Idaho water quality rules and 303(d) standards. *Id.*

Throughout the process, the comments of the public and special-interest groups as well as the Shoshone Bannock Tribes were solicited and considered.  Comments were accepted on the DEIS well beyond the requisite 45 days, and comments were accepted following release of the FEIS that were considered in the RODs issued six months later.

**Order - 20**

Simplot noted that after the selenium problem came to light, the efforts of the phosphate industry, the regulatory agencies, and the Tribe resulted in over fifty reports and an area-wide Administrative Orders on Consent.  Furthermore, phosphate mining plans and operations as well as mitigation and reclamation efforts have improved significantly as a result of ongoing study of the selenium issue.

Simplot emphasized the extensive sampling of surface and ground water, field and laboratory investigation of groundwater resources, and numerous field visits to the proposed expansion site.[10]  *Hamann Dec.* (Docket No. 58); *FEIS* §§ 3.3.5, 3.3.6, and 3.4 to 3.7.  In addition, the Agencies had the advantage of information generated by the Site Investigation ("SI") and the Engineering Evaluation/Cost Analysis ("EE/CA") performed in accordance with the Administrative Order on Consent Simplot entered into with the Agencies, EPA, and IDEQ.

According to Simplot, information gleaned over the years has resulted in significant changes to best mining practices ("BMP").  Furthermore, O'Kane Consultants, Inc. tested over thirty (30) different cover configurations before finalizing the cover design the use of which was approved in the RODs.  *O'Kane Dec.* ¶ 4 (Docket No. 59).  The cover is expected to reduce selenium release into ground and surface water to "well within acceptable limits" and protect against selenium uptake by vegetation growing in the cover.  FEIS at 1-15; BLM ROD at 17-18.

### 2.    Pole Canyon Remediation

Plaintiffs contend that the Forest Service and the mining industry have failed to mitigate the selenium contamination already existing within the Caribou-Targhee National Forest.

---

[10]  This includes 225 geochemistry study samples, over 650 water samples collected from the project area, over 1200 surface water samples from the cumulative effects area, 200 groundwater samples, and 1209 exploratory drill holes covering 33,670 feet.  *Simplot Mem.* at 7-8 (citing *Hamann Dec.*).

Plaintiffs have repeatedly referred to the Smoky Canyon Mine as a "Superfund site"[11] and argue that despite repeated negotiations and investigation, there has been little, if any cleanup of the selenium contamination.  They contend that the Forest Service and BLM "equally erred in relying on the anticipated success of cleanup efforts at Simplot's existing Smoky Canyon Superfund site to offset selenium contamination from the mine expansion" and that such reliance was arbitrary.  *Pls.' Mem.* at 9.  Plaintiffs characterize the success of those efforts as "highly uncertain."  *Id*. at 10.  They point to two planned "limited remediation actions" at Pole Canyon Creek and Panel E and note that the diversion of Pole Canyon "has already failed once."  *Id.*  at 11.  Finally, they conclude that the Agencies have inexplicably accepted Simplot's contractor's view that remediation from these sites alone will make room for selenium from the new mining activity after they initially characterized that opinion as "preliminary" and "one possible interpretation of the available data."  *Id.* at 11-12.

Simplot explained the mitigation/remediation efforts at the Pole Canyon Removal site:

> The Pole Canyon Removal Action involves three primary elements designed to significantly reduce the amount of water entering the overburden: (1) a diversion pipeline routes clean creek flows around the overburden; (2) an upgradient infiltration basin directs clean residual run-off flow from the Pole Canyon Creek valley into the Wells Formation aquifer *prior to contacting the overburden*; and (3) a run-on control channel on the hillside to the north of the overburden captures runoff water from storm events and directs these flows to Pole Canyon Creek below the disposal area. FEIS App. 2A at 2; *Barker Dec*. Ex. N & Ex. O. The pipeline was completed in September 2007. The infiltration basin was completed in November 2007. The run-on control channel will be complete in October 2008. These actions eliminate approximately 98% of the water that previously entered the cross-valley fill and will reduce

---

[11]  The Mine is not on the EPA's Superfund List.  *See Simplot Statement of Facts in Dispute* ¶ 1.  *See also* Forest Service Action Memorandum (Docket No. 62-11) (noting that the Pole Canyon Creek overburden disposal area is not listed on the EPA's National Priority List).  Although Plaintiffs contended at the hearing that "CERCLA" and "Superfund" are used interchangeably, the Court finds that Plaintiffs' characterization of the area as a superfund site to be misleading.

**Order - 22**

selenium load delivered to down gradient surface water features by an estimated 75%. FEIS App. 2A at 6.

*Simplot Mem.* at 11.[12]

Simplot admits that errors by its contractor caused leaks during the initial installation of the pipeline but contends that the errors were corrected and the leaking pipeline replaced. Subsequent testing has demonstrated that the pipeline is successfully diverting upstream Pole Canyon Creek water around the overburden disposal area. Furthermore, the Agencies acknowledged the success of the corrective actions and stated that "[s]ince October 2007, water from upper Pole Creek no longer contacts seleniferous waste rock in the overburden fill and meets State and Federal water quality standards above and below the Pole Canyon fill." BLM ROD at 6.

The Agencies claim that their conclusions that Pole Canyon and Panel E are significant sources of selenium and that the mitigating efforts will abate the selenium are amply supported by the documentary evidence. *Fed. Defs.' Mem.* at 11. They further claim that Plaintiffs fail to identify documentary evidence or other data interpretations the Agencies have ignored and have instead taken one sentence from the FEIS out of context. *Id.* (citing FEIS 4-97). Furthermore, the Agencies state they acknowledged "potential uncertainty" in the FEIS and "still provided a reasonable reflection of projected impacts using the best science available at the time of the analysis." *Id.* (citing FEIS App. 2A pt. 1 pp. 1, 5, 9; and FEIS App. 2A pt. 2 pp. 9-12).

### 3.    Conclusion as to Likelihood of Success on the Merits

Applying the appropriate legal standard, the Court finds that Plaintiffs have little success

---

[12]   At oral argument, Simplot advised the Court that the run-on control channel was essentially complete and awaiting final inspection the following week. The Court presumes the inspection has occurred by this time.

of prevailing on the merits of their NEPA claim.  Plaintiffs do not contend that the Agencies

failed to comply with any of NEPA's procedural requirements other than taking a hard look at

the cover design and remediation plan.  Indeed, they could not.

The FEIS and RODs do not evidence a rush to judgment.  Far from it.  The process from

the initial scoping letter through the issuance of the RODs took five years.  The Agencies

solicited and considered the input of other regulatory and resource management agencies, the

Shoshone Bannock Tribes, the public, and special interest groups.  *See* FEIS §§ 1.5, 3.14, and

6.3.  They accepted comments on the 865-page DEIS well past the required 45 days.  They

created an interdisciplinary team of technical specialists consisting of 25 individuals from the

fields of geology, hydrology, water quality, engineering, and fishery biology.  FEIS § 6.4.  The

Agencies went a step further and contracted with JBR Environmental Consultants to provide

independent expertise in those fields as well as the additional fields of infiltration modeling,

geochemistry, reclamation, benthic ecology, zoology, wildlife biology, and fate and transport of

contaminants.  *Id.*  Finally, the Agencies contracted with Knight-Piesold to review the cover

design and model.

Following almost two years of further study, testing, and comments, the Agencies

released a 1300-page FEIS that included an additional 450 pages of technical appendices.

Comments were again solicited and accepted, review of which culminated in the issuance of the

RODs.

Significantly, given that the primary concern of the Mine expansion was water quality,

the IDEQ was involved from the beginning of the process.  The IDEQ was satisfied that the

cover design, together with the remediation efforts, would result in both ground and surface

water being below water quality standards for selenium.  *Barker Dec.* Ex. E.  Since the project

was predicted to conform with Idaho's water quality standards, the expansion would comply

with the CWA and the NFMA as well.  In fact, the Forest Service had determined that the

proposed Panel F and Panel G expansion would meet the RFP Standard 4-50 because the IDEQ

requirement to protect beneficial uses would be met.  *See Barker Dec.*, Ex. V (Memorandum

from Jim Laprevote to Scott Gerwe, USFS Smoky F&G EIS lead, Soda Springs Ranger District).

The Forest Service noted that it implicitly recognized IDEQ as the lead authority "in

developing/maintaining the 303(d) list, identifying the responsible pollutant(s), and establishing

the acceptable water standards for surface waters within the State of Idaho."  *Id*.

Plaintiffs' major criticism is that the Agencies did not order an additional four days of

testing as advocated by Dr. Carlson.  However, this does not support the conclusion that the

Agencies' actions were arbitrary.  Indeed, the Ninth Circuit very recently addressed a similar

issue where the Forest Service allegedly disregarded the data and opinions of its own soils

expert.  *See Wildwest Institute v. Bull*, 2008 WL 4811890 (9th Cir. Nov. 6, 2008).  There, the

Ninth Circuit noted in finding no NEPA violation that the FEIS had addressed the expert's

opinions and methodology, specifically acknowledged his concerns, and based on his opinions,

somewhat modified the project in the ROD.  The same is true here.

Dr. Carlson felt an additional four days of modeling was necessary.[13]  Apparently, none

of the other scientists did.  The Agencies determined that on the ground field testing and

monitoring would be just as beneficial.  It is not this Court's function act as a "super scientist" to

resolve a dispute between scientific experts or second guess an agency's decision.  *McNair*, 537

---

[13]  It is noteworthy that Dr. Carlson indicated that the proposed cover design "is clearly a significant improvement over the existing covers on the Smoky Canyon Mine and elsewhere in the phosphate mining district in Idaho."  *Id*. at 1.

**Order - 25**

F.3d at 988; *Lands Council v. Martin*, 529 F.3d 1219, 1226 (9th Cir. 2008).  The Agencies

considered Dr. Carlson's comments, their outside expert reran the model and concluded that

there was sufficient information to make a decision, and the BLM ROD imposed enforceable

mitigation and field testing requirements.  "After-the-fact" monitoring following review of

modeling studies is not arbitrary and capricous.  *See Friends of the Payette v. Horseshoe Bend*

*Hydroelectric Co.*, 988 F.2d 989, 993 (9th Cir. 1993).

Fully recognizing that it is not the Court's role to referee disputes between scientists, or to

inject itself into scientific debates, common sense would seem to dictate that it would be better to

run actual on the ground tests on real overburden and cover material to detect selenium leaching

than to run further computer models.  Appendix 2E of the FEIS sets forth detailed requirements

for a two-phased testing procedure to ensure that the cover is performing as modeled.  FEIS App.

2 Monitoring Plan at 9-14.

The BLM ROD summarizes the reasons for field testing, specifies the procedures for

testing, and indicates how the test data will be used:

> As described in Appendix 2E of the FEIS, two test plots will be
> constructed with the same type of material that will be used to
> construct the actual cover over Panels F and G.  While the
> modeling was conducted based on laboratory testing results of bulk
> samples, the two test plots will allow the agencies to determine
> that the characteristics of the materials used in construction
> actually reflect the parameters used in modeling and how variable
> those characteristics are.  Data obtained from the test plots will be
> provided to BLM, USFS, and IDEQ and could be used to amend, if
> necessary, the cover design.  Simplot will also use this data to
> develop the Quality Assurance/Quality Control (QA/QC) Plan for
> construction of the engineered cover over Panels F and G.
>
> Following construction of the test plots, a large-scale test cover
> will be constructed by Simplot at the existing Smoky Canyon
> Mine.  One objective of this large-scale test is to demonstrate
> feasibility of constructing a large area of the Alternative D store

and release cover using methods shown to be effective from the
test plot data.

BLM ROD at 18.

Each test plot will be approximately 2.5 acres.  FEIS App. 2 Monitoring Plan at 9.  In

addition, "[e]ach test cell will be lined and equipped with instrumentation to allow direct

measurement of the net percolation of water through the Alternative D store and release cover."

BLM ROD at 19.  If field testing shows that the cover is not as effective as the modeling

predicted it would be, the BLM will then require additional evaluation and order any necessary

adjustments prior to allowing the project to proceed.  *Id*.  Surely, the information gathered from

the testing in actual conditions will be more beneficial than additional computer modeling would

have been.

The Pole Canyon remediation efforts are complete, and there is no evidence that the

efforts have not been effective in stopping the selenium contamination from the overburden in

that area.  All indications are that they are working as planned.  Although Plaintiffs have pointed

to the Agencies' delay in addressing the selenium problem in general, that is irrelevant to the

preliminary injunction motion.  What is relevant is what is being done now rather than how long

it may have taken to start doing it.

Simplot's comparison of this case to *Northwest Environmental Advocates v. National

Marine Fisheries Service*, 460 F.3d 1125 (9th Cir. 2006), a case in which the Ninth Circuit

upheld the Corps' decision to implement a dredging program in the Columbia River, is

particularly apt.  There, the Court praised the agencies for considering various options for

disposal of dredged material and found that the Corps' decision to change past disposal practices

demonstrated that it had taken a hard look at the impacts of ocean disposal of the dredged

sediment.  The decision further noted that the Corps did not remain with the initially proposed

action throughout the entire project and responded to comments and concerns from the

stakeholders.  The Ninth Circuit was impressed with the fact that other agencies had sanctioned

the environmental analysis, found that the agencies' consultation with independent experts

indicated they had taken a hard look, and deemed it important that the model used by the agency

had been successfully used in other projects.

The Court agrees that all of the factors in *Northwest Env. Adv.* are present here, with the

exception that this particular cover had not been used in this area at the time the FEIS was

prepared.  This supports a finding that the Agencies have taken the requisite hard look required

by NEPA.  Furthermore, the following language of the Ninth Circuit is likewise apt:

> It is not the office of this Court to pass upon the wisdom of an
> agency action or to require an agency to study a proposed action
> *ad infinitum*.  Our role is simply to assure that the agency has taken
> a hard look at the proposed action.  In this case, the Corps has
> demonstrated the hard look by performing exhaustive studies over
> numerous years, soliciting and accommodating input from
> stakeholders, and thoroughly re-analyzing areas of particular
> concern.

*Northwest Env. Adv.*, 460 F.3d at 1145.

The Agencies here took the same hard look.  They were not required to continue studying

the cover design *ad infinitum*.

**B.     Irreparable Harm or Balance of Harms**

Under the Ninth Circuit's continuum, given that Plaintiffs have failed to demonstrate a

likelihood of success on the merits, they are required to make a stronger showing that the public

interest and balance of hardships tip sharply in their favor.  In considering the public interest, the

Court must consider not only environmental interests but also factors such as the impact on the

**Order - 28**

local economy.  The Court finds that they did not meet that burden.

"A preliminary injunction is an extraordinary remedy never awarded as of right.  In each case, courts must balance the competing claims of injury and must consider the effect of each party of the granting or withholding of the requested relief.  In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter*, 2008 WL 4862464 at *12 (citations and internal quotations omitted).

Here, the interests of the Agencies, Simplot, and the other Intervenor-Defendants "must be weighed against the possible harm to the ecological, scientific, and recreational interests that are legitimately before this Court."  *Id*. (listing activities engaged in by plaintiffs such as taking whale watching trips, observing marine mammals underwater, conducting scientific research on marine mammals, and photographing the animals in their natural habitats).

Plaintiffs submitted declarations describing their interests that would be irreparably harmed from continued mining.  *See, e.g., Declaration of Marv Hoyt* at p. 7, ¶ 7 (Docket No. 18-18) (skiing, hiking, backpacking, viewing wildlife, hunting, fishing, taking pleasure in solitude, and for spiritual renewal); *Declaration of Judy Riede* (Docket No. 18-19) (hiking, watching wildlife, fishing, and the like; also noting "no relief from sight or sound of the '24/7' mining operation " and potential for drinking water contamination); *Declaration of Teresa R. Meachum* (Docket No. 18-20) (fishing, hiking, birding, and viewing wildlife; also noting participation in trail improvements projects in the Sage Creek roadless area for both horse and hiker use).

The Court recognizes that several of these Declarants have worked hard to maintain trails in the area and have provided considerable input on the selenium contamination issue.  Furthermore, the Court does not minimize or doubt the sincerity of their positions and those of

other members of Plaintiffs' organizations.  However, many of Plaintiffs' asserted potential

harms are generalized harms asserted in many environmental cases.  Most of them, such as

noise, cutting of trees, and building of roads, would occur from the mining operations  regardless

of whether there was potential for selenium contamination or not.  However, given Plaintiffs'

grounds for seeking the preliminary injunction (i.e., allegedly untested cover design and

unfounded anticipated success of the remediation efforts), the issues before the Court on this

motion pertain only to *possible* further selenium contamination.

On the other hand, as discussed in the various motions to intervene, the harms alleged by

Simplot and the Intervenor-Defendants would be much more immediate and concrete.  *See, e.g.,*

*Whitacre Aff.* ¶ 5 (lost wages and benefits for mine employees), § 6 (significant disruption of

fertilizer market), § 7 (lost wages and benefits for Don Plant employees), § 9 (reduction in

property taxes), ¶ 10 (lost mineral lease royalty payments), ¶ 11 (lost goods and services

purchased from local communities), and ¶ 19 (effects on employees, local communities, vendors

and suppliers, and ultimately the American farmer) (Docket No. 12); *Affidavit of Steven Landon*

(Docket No. 17) (stating there are not enough manufacturing jobs in the Pocatello area to absorb

all employees who would lose their jobs); *Affidavit of Michael Swore* (Docket No. 50) (advising

that his experiment with using less fertilizer to cut costs at his farming operation resulted in

reduction in both the quality and quantity of his crops); *Affidavit of Scott Bird* (Docket No. 52)

(advising that the loss of the effluent water from the Don Plant that he uses to irrigate his crop

land would result in the loss of 500 acres of irrigated crop land); *Affidavit of Gynii A. Gilliam*

(Docket No. 21) (recognizing detrimental effects of closure having participated in the effort to

retrain and re-employ displaced FMC employees locally); *Affidavit of Roger Chase* (Docket No.

22) (same, having dealt with effects of FMC closure as Mayor of Pocatello); *Affidavit of Power*

**Order - 30**

*County Commissioners* (Docket No. 26) (noting the large shortfall in tax revenues and substantial economic repercussions when FMC's plant in Power County closed).

Simplot's counsel emphasized at oral argument that selenium will not reach peak concentration levels at South Fork Sage Creek from Panel F for 118 years, and it will not reach peak concentration levels from Panel G for 369 years.  Even factoring in some margin of error, it is unlikely that any significant contamination would occur for many years.  When weighing the distant and generalized *possible* harms alleged by Plaintiffs against the more immediate and specific probable harms alleged by Simplot and the Intervenor-Defendants should the Mine and Plant need to reduce operations or close, the Court must find that the balance of harms weighs sharply in favor of Simplot and Intervenor-Defendants.

Plaintiffs do not dispute the economic consequences of a Mine and Don Plant closure. Rather, they contend that Simplot's predictions of a closure are overstated given Plaintiffs' position that this case can be litigated to completion within a short time before there would be any significant disruption of Simplot's operations.  However, as Simplot points out, Plaintiffs ignore the "very real physical and regulatory constraints on when work can be performed, because of snow pack, spring runoff, the presence of wildlife, safety, and other considerations." *Simplot Mem.* at 28.  Nor can Simplot turn to other sources of phosphate to run the Don Plant. The Don Plant has now been converted to use "wet" phosphate from the slurry pipeline.  It has dismantled and abandoned the process for using dry phosphate which had been shipped to the Plant years ago in trucks and by railroad cars.  In fact, one reason to move away from using dry phosphate ore to the current process was to reduce harmful pollutants in the Pocatello area. Indeed, the argument that the time frame for completing this litigation is  relatively short favors Defendants more than Plaintiffs given that any harm to the environment from selenium will be

slight during that relatively short time frame.

Just as the plaintiffs in *Winter* sought to enjoin or substantially restrict Naval training exercises that had been taking place for 40 years, the latest of which were not approved until after the defendant had taken the requisite "hard look" at the environmental consequences of the exercises, Plaintiffs here seek to enjoin or substantially restrict phosphate mining that Simplot has engaged in since 1983, the latest expansion of which was not approved until after the Agencies took the requisite "hard look" at the environmental consequences.  *See Winter* at *11 (finding it "pertinent that this is not a case in which the defendant is conducting a new type of activity with completely unknown effects on the environment.").  In sharp contrast to an activity that is new with unknown effects on the environment, the phosphate mining activity has been taking place for years, more recently with the known effect of selenium contamination.  Having identified that detrimental effect, isolated sources of selenium contamination, and developed monitoring and mitigation methods incorporating lessons learned in the last ten years, the Agencies and Simplot appear to be in a good position to prevent or substantially reduce selenium contamination from the activities associated with the mine expansion.  Furthermore, the BLM has the discretion to require changes to the cover if it performs inadequately and to order Simplot to cease mining.  BLM ROD at 8.  Therefore, there is not a likelihood of irreparable harm justifying the drastic measure of a preliminary injunction.[14]

---

[14]  In its Reply (Docket No. 78) to Simplot's Response to the preliminary injunction motion, Plaintiffs included declarations regarding an alternative approach to selenium cleanup, a plan for transitioning the Don Plant for accepting phosphate from an alternate source, and Simplot's plans to submit a mine plan for Dairy Syncline.  In addition, the Reply argued that Simplot has an alternative source of phosphate in either its own Vernal, Utah, mine or those of Ashley Creek.  Simplot filed a Motion to Strike Reply (Docket No. 89) or to file a sur-reply which it submitted with its motion.  Rather than strike the Reply that went well beyond the issues raised in the Response, the Court has considered the proposed Sur-Reply.  Therefore, the Court will deny the Motion to Strike.

**CONCLUSION**

The Court finds that Plaintiffs have neither demonstrated a likelihood of success on the merits of their NEPA, CWA, and NFMA claims, nor have they demonstrated that the public interest and the balance of harms tip in their favor.

The on-going enforceable monitoring requirements of the CERCLA Administrative Order of Consent for Pole Canyon, the Reclamation Plan for closure of Panel E, and the Consent Order with the IDEQ which covers the entire area around Panels F and G will ensure that any environmental harm will be discovered and remedied quickly.  To the extent something unforeseen may happen between now and the conclusion of this case, i.e. the monitoring of the cover design shows that it is failing to address selenium contamination, mining operations will cease.

After a thorough review of the FEIS, RODs, exhibits, and briefing of the parties, the Court find that the CERCLA consent agreement and the Agencies' strict quality control/quality assurance requirements ensure that the effects of Simplot's mining and remediation activities will be closely monitored and that new methods of control will be put into place as necessary.

As a final observation, the Court notes that with the wealth of shared information between the NEPA and the CERCLA technical teams, it is difficult to imagine how the project could have been studied much more thoroughly.  Certainly, four additional days of modeling would not have made much difference.  Either it would have confirmed the previous modeling findings to date or it would not.  If it had not, then those results would likely have been just one more factor for the technical teams to consider.  Again, without supplanting its views for that of the experts, the Court's layman's view would be that modeling is simply modeling and actual field testing and measurements would provide a far clearer picture of what was actually

occurring with seasonal precipitation.  The Agencies did not act arbitrarily or capriciously in deciding to call an end to the modeling.  Therefore, Plaintiffs have not demonstrated a likelihood of succeeding on the merits.  Even if they had, they have not demonstrated a likelihood of irreparable harm or that the balance of harms tips in their favor.  Accordingly, the Court will not resort to the extraordinary remedy of a preliminary injunction.

**ORDER**

IT IS HEREBY ORDERED that Plaintiffs' Motion for Preliminary Injunction (Docket No. 18) is DENIED.

IT IS FURTHER HEREBY ORDERED that Simplot's Motion to Strike Reply to Response to Motion (Docket No. 89) is DENIED.



DATED: November 26, 2008

_____
Honorable Mikel H. Williams
Chief United States Magistrate Judge