IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

GREATER YELLOWSTONE COALITION, *et al.*, )
                                    )
            Plaintiffs,          )      Case No. CV-08-388-E-MHW
                                      )
v.                                    )      **MEMORANDUM DECISION**
                                      )      **AND ORDER**
BRENT LARSON, Supervisor, Caribou-     )
Targhee National Forest, in his official capacity, )
*et al.*,                                  )
                                      )
            Defendants.       )
                                      )
and                                   )
                                      )
J.R. SIMPLOT COMPANY, *et al.*,       )
                                      )
            Intervenor-Defendants,  )
                                      )
                                      )

      Greater Yellowstone Coalition, Natural Resources Defense Council, Sierra Club, and

Defenders of Wildlife ("Plaintiffs") challenge the decision of the U.S. Forest Service ("Forest

Service") and the Bureau of Land Management ("BLM") (collectively, the "Agencies" or

"Federal Defendants") to allow expansion of the J.R. Simplot's ("Simplot") Smoky Canyon

Mine (the "Mine") into two new panels that have not been previously subject to phosphate

mining.  Pending before the Court are Plaintiffs' Motion for Summary Judgment (Docket No.

156), Simplot's Cross Motion for Summary Judgment (Docket No. 173), and the Federal

Defendants' Cross Motion for Summary Judgment (Docket No. 183).

Because review of agency actions is limited to the administrative record without triable

facts, summary judgment may be granted to either party based on a review of that record.  Having

carefully reviewed the record and having considered the briefing and oral arguments of all

parties, the Court enters the following Order denying Plaintiffs' motion and granting Simplot's

and the Federal Defendants' motions for the reasons set forth below.

## PROCEDURAL BACKGROUND

As more thoroughly discussed in a prior Order (Docket No. 104), Plaintiffs brought this

action against the Federal Defendants challenging their decision approving the Mine expansion

and claiming that the expansion will result in irreparable harm to the environment and will

adversely impact their members' enjoyment of recreational, aesthetic, and conservation interests

within the Caribou-Targhee National Forest (the "Forest").  The Court granted Simplot, various

Idaho and Wyoming cities and counties, United Steelworkers Local 632, and the Idaho Farm

Bureau Association intervenor status.  *See Orders* (Docket Nos. 82 and 97).

On September 22, 2008, Plaintiffs filed a motion for a preliminary injunction on their

claims under the Clean Water Act, National Forest Management Act, and the National

Environmental Policy Act.  Plaintiffs argued that the Agencies had failed to adequately address

the selenium contamination that could occur if the Mine expanded.  After extensive briefing and

oral argument, the Court denied Plaintiffs' motion finding that Plaintiffs had neither

demonstrated a likelihood of success on the merits of their claims nor demonstrated a likelihood

of irreparable harm or that the balance of harms tipped in their favor.  *See Order* (Docket No.

104). Plaintiffs appealed the Court's decision to the Ninth Circuit Court of Appeals and also filed a Motion for Preliminary Injunction Pending Appeal (Docket No. 106) which the Court denied. *See Order* (Docket No. 120). The Ninth Circuit likewise denied Plaintiffs' motion for preliminary injunction pending appeal. *See USCA Order* (Docket No. 124).

On April 10, 2009, the Ninth Circuit issued a Memorandum decision finding no abuse of discretion in the Court's preliminary conclusion that Plaintiffs were not likely to succeed on the merits of their claims and that Plaintiffs had not established a likelihood of irreparable harm due to potential selenium contamination. *See USCA Mem.* (Docket No. 129). However, the Ninth Circuit also found that the Court failed to consider the harm caused by Simplot's preparatory expansion activities when reaching a decision on the irreparable harm analysis. Accordingly, the Ninth Circuit vacated the Court's Order and remanded the case for consideration of the effect of the preparatory activities. In doing so, it issued a temporary stay until the Court had an opportunity to re-analyze the irreparable harm issue.

On May 13, 2009, the Court entered an Order lifting the temporary stay allowing the preparatory work to proceed. (Docket No. 160.) On June 4, 2009, the Ninth Circuit denied a second emergency motion for injunction pending appeal of the Court's order lifting the stay. *See USCA Order* (Docket No. 170).

On July 24, 2009, the Court heard argument on the pending summary judgment motions. On July 25, 2009, the Court conducted a 6-hour site visit of the Smoky Canyon Mine. The Court was accompanied by counsel and a party representative for each of the parties. The Court viewed panels that have been previously mined for phosphate and since reclaimed, the Pole Canyon remediation area, the panels subject to current mining activities, current site preparation and

mining on Panel F, and the undisturbed area of the Forest where Panel G will be developed.  The Court also viewed the method being used to divert water from various panels.  Finally, the Court viewed South Fork Sage Creek and Hoopes Springs.  With the concurrence of counsel, photographs were taken at various locations during the site visit.  These photographs and comments by the Court as to its observations at these various locations will be filed as a Court exhibit within ten (10) days from the date of this Order.

## BACKGROUND OF PHOSPHATE MINING

In its Order denying Plaintiffs' preliminary injunction motion, the Court reviewed the history of phosphate mining in southeastern Idaho in general and the history of Simplot's mining endeavors in particular.  The Court believes this background is important when reviewing the merits of the claims, and will again revisit that information to place the decision in context.

**A.      History of Phosphate Mining[1]**

In the 1870s, prospectors staked mining claims in southeastern Idaho and dug numerous pits and tunnels searching for copper, gold, or silver.  At times, this prospecting activity occurred in areas containing phosphate rock.  In the early 1900s, various individuals and groups started to recognize the potential value of some of these old mining claims, not for gold or silver, but for phosphate which could be used to produce fertilizer.

In 1908 and 1909, pursuant to a number of Secretarial Orders, the Secretary of the Interior withdrew from entry over 5 million acres of public lands in the West containing phosphate.  Almost half of those lands were later restored.

---

[1] This information is taken from *A History of Phosphate Mining in Southeastern Idaho* (Barker Dec. Ex. C) (Docket No. 60-4).

**Memorandum Decision and Order - 4**

In 1910, President Taft signed into effect the Pickett Act which gave the executive branch the power to withdraw public lands to protect phosphate reserves from foreign acquisition and to ensure that the United States would not be dependent on European countries for phosphate. Under the Act, the government withdrew approximately 2,500,000 acres in Idaho, Wyoming, and Utah that had formerly been temporarily withdrawn by the Secretary of Interior and designated them as the Western Phosphate Reserve.[2]  Litigation in the courts and Congress' efforts to establish a method of patenting phosphate claims over the next few years culminated in the passage of the Mineral Leasing Act ("MLA") in 1920.  Under the MLA, phosphate was removed from the jurisdiction of the Mining Act of 1872, and a royalty system was established to provide income to the federal government.  Since the enactment of the MLA, access to the phosphate reserves is available only through a competitive leasing process.  The United States designated certain Known Phosphate Lease Areas ("KPLA") in the Caribou-Targhee National Forest which are subject to that leasing process.

Pursuant to the MLA, the BLM administers 84 phosphate mineral leases on 46,000 acres of land in southeastern Idaho, some of which are held by Simplot.  The BLM cooperates with the Forest Service, Idaho Department of Environmental Quality ("IDEQ"), and other state and federal agencies in evaluating and mitigating any adverse environmental consequences of phosphate mining.

**B.     Selenium Contamination[3]**

---

[2]  Southeastern Idaho's portion of the phosphate reserves covers over 500,000 acres.  FEIS 5-1.

[3]   This information is taken from *Response to Selenium Contamination at Phosphate Mines in Southeastern Idaho* (Barker Dec. Ex. F) (Docket No. 60-7) unless otherwise noted.

**Memorandum Decision and Order - 5**

Phosphate is mined from open pits.  First, dirt, rock, and other material are removed from the site to expose the phosphate ore.  This material is otherwise known as overburden.  When a pit is mined out, it is backfilled with the overburden and reclaimed.  Excess overburden is disposed of in sites adjacent to the mine pits and also reclaimed.  Prior reclamation practices called for planting new vegetation directly on the overburden.

Phosphate in the southeastern Idaho area contains selenium which in small quantities is a necessary nutrient in plant and animal life.  A problem arises, however, when the overburden from phosphate mining is exposed to the elements causing the selenium to concentrate and become toxic.  Precipitation falling on the seleniferous waste causes infiltration into the groundwater or runoff into the ground or nearby streams.

In 1996, toxic amounts of selenium were discovered in some of the waters in southeastern Idaho, near the phosphate mines, after numerous livestock deaths occurred and abnormalities in aquatic life were noted.  The source of the selenium contamination was determined to be water percolating through the mines' overburden into the groundwater, draining into surface water, or being absorbed by vegetation.  Animals ingesting vegetation growing out of the overburden areas or being irrigated by contaminated water necessarily ingested concentrated amounts of selenium.  These incidents occurred in a separate drainage from the one in which Simplot's Mine is located.  FEIS 2-17; 5-26.

Once the selenium problem was discovered, five phosphate mining companies in southeastern Idaho, including Simplot, formed an ad hoc committee of the Idaho Mining Association and collaborated with representatives from various state and federal agencies to form the Selenium Working Group to identify the sources of the selenium contamination and to work

towards mitigation of past selenium contamination and prevention of future selenium

contamination.[4]

In 2000, a Memorandum of Understanding concerning Contamination from Phosphate

Mining Operations in Southeastern Idaho ("MOU") was entered into by federal regulatory

agencies (USFS, BLM, EPA, USFWS, and BIA), the IDEQ, and the Shoshone-Bannock Tribes.

The MOU placed control of addressing the selenium problem on the regulatory agencies under

the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").

The mining companies agreed with this change in management and entered into an enforceable

Area-wide Consent Order and Administrative Order on Consent (CO/AOC).

Site specific investigations by the appropriate lead agency as set forth in the MOU were

to follow.  Towards that end, in 2003, Simplot entered into a CERCLA Administrative Order of

Consent to conduct a Site Investigation ("SI") and Engineering Evaluation/Cost Analysis

("EE/CA") pertaining to Smoky Canyon Mine.  *Barker Dec.* Ex. G. (Docket No. 60-8).

Numerous studies, site investigations, and evaluations followed, including geochemistry studies;

groundwater and surface water resource studies; wildlife surveys; wetlands field investigations;

geological explorations; vegetation surveys; soil inventories; cultural resource surveys;

fisheries/aquatic resource sampling; and over 30 agency field visits exclusive of visits by agency

personnel, non-government organizations, and interested citizens.  *Declaration of Lori Hamann*

---

[4]   The agencies initially included the Forest Service, the BLM, IDEQ, the Idaho Department of Lands ("IDL"), and the Idaho Department of Fish and Game ("IDFG").  Subsequently, others joined the process but were not part of the Selenium Working Group.  They are the U.S. Fish and Wildlife Service (USFWS), the U.S. Environmental Protection Agency ("EPA"), U.S. Bureau of Indian Affairs, and Shoshone-Bannock Tribes. Representatives of the public, local environmental interest groups, academic community, veterinary and agricultural sciences, and the press also participated in the Working Group's open meetings.  Ultimately, a smaller "Selenium Steering Committee" was formed consisting of a single responsible representative from each organization within the Selenium Working Group.

("Hamann Dec.") (Docket No. 58).

## C.    Simplot's Mining Operation

Pursuant to the MLA, Simplot leases Caribou National Forest KPLA land on which its

Smoky Canyon Mine (the "Mine") is located.  The Mine is ten miles west of Afton, Wyoming,

and 110 miles south of Yellowstone National Park.

Simplot commenced this phosphate mining operation in 1983.  It consists of several

sections known as Panels A, B, C, D, and E, the mining of which was authorized by the Forest

Service and BLM at various times from 1982 through 2002.  After the phosphate is mined, the

ore is converted on site into a liquid slurry which is transported through a buried pipeline to

Simplot's Don Fertilizer Plant ("Don Plant" or "Plant") near Pocatello, Idaho, a distance of over

80 miles, where it is processed into fertilizer.  The Mine has been the sole supplier of phosphate

to the Don Plant since Simplot developed the pipeline system and discontinued dry handling of

phosphate ore in the 1990s.  *Declaration of William J. Whitacre* ¶  4 ("*Whitacre Dec.*") (Docket

No. 12); *Declaration of Martin Hunt* ¶ 9 (Docket No. 85).  At that time, Simplot "retired and

abandoned any facilities to transport, receive or utilize non-slurried ore at the Don Plant."

*Whitacre Dec.* ¶ 4.

In April 2003, having exhausted supplies of phosphate in all but one of its previously

approved panels, Simplot submitted a Mining and Reclamation Plan ("Mining Plan") to the

Agencies seeking authorization to expand its mining operations into adjacent Panel F, initially

leased in 2001, and Panel G, initially leased in 1951, to ensure an uninterrupted supply of

phosphate for the Don Plant.  Without expansion, the Mine will have exhausted its existing

reserves by mid-summer of 2010.  *Declaration of Dennis L. Facer*  ("*Facer Dec.*") ¶ 3 (Docket

No. 11).

In order to limit selenium contamination, the Mining Plan proposed that the Mine's overburden would be covered with a cover of chert[5] and topsoil.  FEIS 2-49.  Simplot submitted that the cover would store and remove precipitation from the overburden piles through runoff, evaporation, and plant transpiration, thereby preventing potentially dangerous levels of selenium from percolating through the overburden to the groundwater and then into surface water.

**D.      Agencies' Action**

In September 2003, in response to Simplot's proposed Mining Plan, the Forest Service and BLM issued a scoping letter regarding the need for an environmental impact statement for Smoky Canyon Mine Panels F and G.[6]  The scoping letter was followed by two public meetings. Two years later, in December 2005, the Agencies issued for comment a draft environmental impact statement ("DEIS") which discussed several alternatives.  Two of those alternatives are relevant here.  Alternative D, which was rejected, proposed a 12-inch thick compacted Dinwoody shale infiltration barrier covered by chert and topsoil.  The proposed barrier was to be a series of overlapping "shingles" composed of Dinwoody material that would keep moisture out of the reclaimed pit.  The DEIS  recommended Alternative B.  That alternative "would have eliminated all selenium overburden fills external to the pit boundaries."  FEIS 2-107.

---

[5]  The term "chert" as used in the FEIS "refers to overburden with a low selenium concentration and can include chert, cherty limestone, and limestone."  FEIS at 2-37.

[6]  Because the mining leases are administered by the BLM and the leases are located on Caribou National Forest land administered by the Forest Service, both agencies participated in the review of the proposed expansion and ultimate preparation of the FEIS as lead and co-lead agencies, respectively.  BLM ROD at 1. However, the Agencies prepared separate RODs.  The IDEQ participated in the preparation of the DEIS and FEIS as a cooperating agency.  *Id*. at 2.

As more thoroughly described below, Simplot thereafter went through a significant amount of study and refinement of its cover design.  Two years later, on October 26, 2007, the final environmental impact statement ("FEIS") was made available for public review and comment.  The FEIS adopted a variation of Alternative D, which would use topsoil, Dinwoody material, and chert for maximum moisture storage and subsequent removal of moisture by evapotranspiration instead of the shingle-type infiltration barrier addressed in the DEIS.  FEIS 2-49.  As stated in the FEIS, "A store and release cover limits net percolation of moisture into underlying materials, not with a low permeability infiltration barrier but by maximizing soil moisture storage for the subsequent removal by evapotranspiration.  Evapotranspiration is the sum of evaporation and plant transpiration."  *Id.*  In effect, the FEIS chose a modification of the previously rejected Alternative D as the preferred alternative for the Mine expansion after concluding, based on computer modeling and other studies, that the new cover design would result in selenium levels well below the Idaho water quality standard.

The Agencies received and considered additional comments on the FEIS from interested parties, including Plaintiffs.  On June 6, 2008, the Agencies issued their respective Records of Decision ("RODs") approving the Mine expansion into Panel F and Panel G.  Plaintiffs, who had commented throughout the approval process, appealed the Forest Service ROD.  The appeal was denied on September 25, 2008.  There was no procedure for administratively appealing the BLM ROD.  After providing the Forest Service and BLM a 60-days' notice of intent to sue under the Clean Water Act, Plaintiffs filed this action seeking declaratory and injunctive relief.

## STANDARD OF REVIEW

**A.     Standard of Review under the APA**

Challenges to agency actions are reviewed under the deferential standard of the

Administrative Procedure Act ("APA").  *Tuscon Herpetological Soc. v. Salazar*, 566 F.3d 870,

875 (9th Cir. 2009).  This narrow APA standard dictates that a reviewing court may set aside an

agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." *Id*. (citing 5 U.S.C. § 706(2)(A)).  *See also Siskiyou Regional Educ.*

*Project v. U.S. Forest Service*, 565 F.3d 545 (9th Cir. 2009) (NFMA); *North Idaho Community*

*Action Network v. U.S. Dept. of Transportation*, 545 F.3d 1147 (9th Cir. 2008) (NEPA);  *Lands*

*Council v. McNair*, 537 F.3d 981, 987 (NEPA and NFMA); *Swanson v. U.S. Forest Service*, 87

F.3d 339, 345 (9th Cir. 1996) (CWA).  A court should "reverse a decision as arbitrary or

capricious only if the agency relied on factors Congress did not intend it to consider, 'entirely

failed to consider an important aspect of the problem,' or offered an explanation 'that runs

counter to the evidence before the agency or is so implausible that it could not be ascribed to a

difference in view or the product of agency expertise.'" *McNair*, 537 F.3d at 987 (citation

omitted).  Although the standard of review under the APA is narrow, a court must engage in a

"substantial inquiry" and  "a thorough, probing, in-depth review," while "the agency must

present a rational connection between the facts found and the conclusions made." *Siskiyou*, 565

F.3d at 554 (internal quotations and citations omitted).

Except in limited circumstances, judicial review is limited to review of the administrative

record underlying the challenged decision.  *Thompson v. Dept. of Labor*, 885 F.2d 551, 555 (9th

Cir. 1989).  The administrative record "'consists of all documents and materials directly or

*indirectly* considered by the agency decision-makers and includes evidence contrary to the

agency's position.'"  *Id*. (quoting *Exxon Corp. v. Dept. of Energy*, 91 F.R.D. 26, 32 (N.D.Tex.

1981)) (emphasis in original).  Judicial review should be focused on the record in existence at the time of the agency's decision.  *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005); *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *Southwest Ctr. for Biological Diversity v. U. S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996); *Thompson*, 885 F.2d at 556.

In determining whether an agency action is arbitrary and capricious, the court must not assume the role of a scientist and need not agree with the agency's decision.  *McNair*, 537 F.3d. at 988.  Rather, agencies have the discretion to rely on its own experts' reasonable opinions to resolve a conflict between or among specialists.  *Id*. at 1000 (citing *Marsh v. Oregon Nat. Resources Council*, 490 U.S. 360, 378 (1989)).

## GOVERNING STATUTORY PROVISIONS

**A.      Clean Water Act ("CWA")**

The stated purpose of the Clean Water Act (33 U.S.C. §§ 1251 to 1376) is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  Under the Act, federal agencies have a duty to ensure that activities carried out on federal land comply with state water quality standards in the same manner and to the same extent as any nongovernmental entity.  *See* 33 U.S.C. § 1323(a).  Idaho law authorizes the Idaho Department of Water Quality ("IDEQ") to promulgate regulations to achieve maintenance of existing beneficial uses of waters.  *Idaho Code*, § 39-3601; § 39-3603.  Those regulations appear at Idaho Administrative Code 58.01.02.001, *et seq*.

As relevant here, Idaho law prohibits discharge of pollutants that "[w]ill or can be

expected to result in a violation of the water quality standards applicable to the receiving water body or downstream waters; or . . . [w]ill injure designated or existing beneficial uses. . . ." Idaho Admin. Code r. 58.01.02.080.01.  Finally, for waters that are listed as impaired pursuant to § 303(d), Idaho law requires that any  activity be restricted "as necessary to prohibit further impairment of . . . designated or existing beneficial uses."  Idaho Admin. Code r. 58.01.02.054.05.

### B.     National Forest Management Act ("NFMA")

For each unit in the National Forest System, NFMA requires the Forest Service to develop comprehensive management plans with which any subsequent "plans, permits, contracts, and other instruments for the use and occupancy" must be consistent.  *Earth Island Institute v. U.S. Forest Service*, 351 F.3d 1291, 1300 (9th Cir. 2003) (citing 16 U.S.C. §§ 1604(a) and (i)). As explained by the Ninth Circuit:

> The NFMA sets forth the statutory framework and specifies the procedural and substantive requirements under which the Forest Service is to manage National Forest System lands.  Procedurally, the NFMA requires the Forest Service to develop a forest plan for each unit of the National Forest System.  16 U.S.C. § 1604(a).  In developing and maintaining each plan, the Forest Service is required to use "a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences."  *Id.* § 1604(b).  After a forest plan is developed, all subsequent agency action, including site-specific plans . . . must comply with the NFMA and be consistent with the governing forest plan. *Id.* § 1604(i).

*McNair*, 537 F.3d at 988-89.

### C.     Mineral Leasing Act ("MLA")

As relevant here, the Mineral Leasing Act governs the form and manner of disposition of national forest land containing phosphate deposits.  *See* 30 U.S.C. § 181, *et seq.*  The MLA

authorizes the Secretary of the Interior to issue leases for the exploration, development, and

utilization of mineral deposits subject to rules and regulations promulgated by the Secretary.  30

U.S.C. § 192c.  With respect to known phosphate deposits in particular, the Secretary of the

Interior may lease phosphate deposits and lands containing such deposits through a competitive

leasing process.  30 U.S.C. § 211(a).  With respect to areas in which the existence or workability

of phosphate deposits is unknown, the Secretary of the Interior may issue a prospecting permit.

30 U.S.C. § 211(b).  The Secretary has promulgated regulations regarding mineral leasing and

permitting.  *See* 43 C.F.R. §§ 3500.0, *et seq*.

  **D.**  **NEPA**

  NEPA requires agencies to have available and carefully consider "'detailed information

concerning significant environmental impacts' and make that information available to the

public."  *North Idaho Community Action Network v. United States Department of*

*Transportation*, 545 F.3d 1147, 1153 (9th Cir. 2008) (citing *Robertson v. Methow Valley Citizens*

*Council*, 490 U.S. 332, 349 (1989)).  Stated another way, NEPA requires a federal agency to

"'consider every significant aspect of the environmental impact of a proposed action . . . [and]

inform the public that it has indeed considered environmental concerns in its decisionmaking

process' . . .  In order to accomplish this, NEPA imposes procedural requirements designed to

force agencies to take a 'hard look' at environmental consequences."  *Earth Island Institute v.*

*U.S. Forest Service*, 351 F.3d 1291, 1300 (9th Cir. 2003) (internal citations omitted).  NEPA

"exists to ensure a process" as opposed to imposing substantive requirements on federal

agencies.  *McNair*, 537 F.3d at 1000 (citation omitted).

**DISCUSSION**

**A.      Clean Water Act**

Plaintiffs contend that the Agencies violated the Clean Water by arbitrarily relying on Simplot's store and release cover and on the anticipated success of the Pole Canyon remediation and the Panel E reclamation in reducing existing selenium levels.  They also contend that the Agencies erred in finding that the Mine expansion would not further impair the § 303(d) listed streams in the area of the Mine and that the selenium level in the unimpaired surface and groundwater would remain within Idaho's water quality standards.

Plaintiffs also argue that the Agencies acted illegally in not requiring that Simplot obtain a Section 401 permit under the Clean Water Act.  *See* 33 U.S.C. § 1341(a)(1).  This section requires a water quality certification from a state before a federal license or permit can be issued for activities that may result in any discharge into navigable waters.

The Court previously addressed the cover design and planned remediation issues in its decision denying Plaintiffs' preliminary injunction motion and determined that Plaintiffs had demonstrated little likelihood of success.  A further review of the parties' positions following briefing and oral argument on the merits reinforces that decision.

**1.      Store and Release Cover Design**

The crux of Plaintiffs' argument regarding the store and release cover design is that the Agencies ignored the concerns of Dr. Christopher Carlson ("Carlson"), the Forest Service's National Ground Water Program Leader, regarding the ability of the cover design to prevent selenium contamination at the Smoky Canyon Mine.  Those concerns included what Carlson characterized as numerous "short cuts" and "shortcomings" and an evaluation that ignored seasonal variations in assessing the cover's ability to store and release precipitation.  Carlson

believed it would have taken only an additional four working days to run the model to produce

the information he felt would have demonstrated the cover's ability or inability to accommodate

seasonal surges of precipitation.  Plaintiffs conclude that the Agencies' decision to terminate

computer modeling and verify the model's findings by on-site testing was arbitrary and

capricious.  Plaintiffs rely primarily on five documents in support of their argument:

1.  January 4, 2005 Agency Memo (AR FS 1000158) which contained minutes of a 12-14-04 Panel EIS Conference Call – noting comments held at a then recent Caps and Covers Conference raised doubts about the effectiveness of caps and infiltration barriers in the phosphate mining area of Idaho.

2.  October 19, 2006 Carlson Memo (AR FS 000393) in which Carlson expressed concern about perceived failure of the modeling to account for seasonal aspects of the hydrological cycle and the Agencies' decision not to require an additional four days of modeling to generate monthly rather than yearly outputs.

3.  October 26, 2006 Agency Memo (AR BLM 005581) – referencing Carlson's desire to require the additional four days of modeling.

4.  November 13, 2006 Albright Memo (AR FS 00042) – responding to Scott Gerwe's inquiry about recommended vegetation to be planted on the cover surface, Albright noted that it was a "tough" problem because most of the precipitation "comes when there is little or no evapotranspiration and as snow which melts slowly and creates a lot of infiltration" and noting that they would not be able to build a cover that would limit drainage to zero or near-zero.

5.  January 26, 2007 Carlson Memo (AR BLM 005862) – (to Scott Gerwe –Project Manager) sets forth in detail Carlson's concerns about the cover design in existence at that point, making recommendations for construction and testing.

6.  July 7, 2007 Agency Memo (AR BLM 006213) – setting forth recommendations regarding the Forest Service WO Assessment of the Cover System – states reasons for accepting the cover design.  Plaintiffs cite it for the reference on page 3 for failure to output monthly values.

Reliance on those few documents and the opinion of one individual stands in stark contrast to the thousands of pages of documents in the Administrative Record and the opinions of 24 other members of the interdisciplinary team assembled by the Agencies who commented on and approved the cover design. *See* AR BLM 06123 and FEIS 6-22 (indicating that Carlson was a member of both the six member technical review team and the 25-member interdisciplinary team assembled by the Agencies).   The technical review team consisted of members of the BLM, Forest Service, and the IDEQ. *Id.*

The documentation relied on by Plaintiffs is not persuasive.  Simplot observes that the January 2005 Agency Memo was written before any cover design or modeling was done. Furthermore, the Court notes that the cited provision appears to refer to general comments made at a conference addressing no particular design and no particular location.  The Court finds that while the comments may serve as an indication of generalized concerns about caps and covers, they are irrelevant to a specific cover designed after months of testing various materials for use on a specific site.

The October 26, 2006 Carlson e-mail obviously predated the final cover design which was submitted in May 2007.  As discussed in more detail below, most of Carlson's concerns were addressed in either the final design or by the required Quality Control and Quality Assurance program, the results of which would be supervised and monitored by an independent third-party consultant.

The November 13, 2006 Albright Memo contains general comments, based on no specific information, by an individual who was merely asked by Scott Gerwe about the advantages and

disadvantages of the use of certain species of vegetation over the cover.

The January 26, 2007 Carlson Memo sets forth Carlson's remaining reservations, concerns, and recommendations.  Although somewhat supportive of Plaintiffs' position, this memorandum shows that Carlson did not ultimately reject or dissent from the cover design. Rather, he suggested tight monitoring and some additional steps, most of which were adopted by the Agencies, to ensure that the cover worked as proposed.

Finally, the July 6, 2007 Agency Memo, while noting that there was "some uncertainty within the technical review team about the short-term accuracy of the Vadose/W model results" caused by the lack of monthly outputs in the computer modeling, ultimately supports the Agencies' view that it considered Carlson's comments, yet decided to go ahead with the design based on the detailed reasons in the memorandum.

In contrast, the record reflects the extensive testing and analysis of the cover design that was reviewed by the inter-agency technical review team, including:

> (1) assessment of 225 samples from 52 drill holes in the Panels F and G area to develop geochemistry baseline data, FEIS 3-8;
>
> (2) material testing of Dinwoody material, chert, and topsoil to determine the hydrologic properties of each material, FEIS 2-50; AR BLM 45332 at 45693 (Drew Morrison Memorandum, July 12, 2006);
>
> (3) collection of climate data from nine sites around Panels F and G to generate a 100-year climate profile for Panel F and G, FEIS 2-51, AR BLM 46320, 46336-38 (Report: One Dimensional Modeling of Soil Cover System Alternatives, Apr. 2006);
>
> (4) 1-D VADOSE/W modeling to assess the effect of thirty-three different variables on cover system performance, see FEIS 2-52;

(5) 1-D VADOSE/W modeling to assess the vertical performance of the selected Cover System across all 100-years of climate data, FEIS 2-51;

(6) small-scale 2-D VADOSE/W modeling to assess the vertical and horizontal performance of the Cover System across a short slope and all 100 years of climate data, FEIS 2-52; AR BLM 45244, 45255-56 (Simplot Feasibility Engineering Report, July 2006);

(7) full-scale 2-D VADOSE/W modeling to assess the performance of the Cover System across the entire length of the proposed expansion and twenty years, including the five wettest years in the 100-year period; AR BLM 45244, 45253-45255 (Simplot Feasibility Engineering Report, July 2006); and

(8) SEEP/W modeling to assess the rate at which water percolating through the Cover would descend through overburden and the 200 to 750 feet of undisturbed material beneath the overburden and enter groundwater, FEIS 4-34; AR BLM 45332 at 45705 (Report: Predicted Seepage Rates into Aquifer Beneath Backfilled Panels for 100-Year Period (O'Kane, July 2006) 4 SER 964-93.

The Agencies also hired their own expert consultants to validate both the 1-D and 2-D model studies, AR BLM 04890 (Memorandum, Kunkel to Buck, Apr. 12, 2006), AR BLM 05011 (Memorandum, Conrad to Buck, May 12, 2006), and submitted VADOSE/W model output to the model developer for review, AR BLM 04864 (Memorandum, Newman to Carlson, Mar. 20, 2006).

*Fed. Defs.' Mem*. at 12.

As the Federal Defendants point out, in addition to the cover system, a "200 foot depth of overburden, and 250 to 750 feet of undisturbed material beneath the overburden smooths out the rate at which water actually enters groundwater." Citing the explanation in the FEIS that "short-term variations in percolation rates from year to year may be significant at the ground surface but *do not affect the recharge rate at the deep water table*," the Federal Defendants state that seasonal variation is less likely than annual variation to have an effect on the deep water table.

*Fed. Defs. Mem.* at 16 (citing FEIS 4-35; 4-34) (Court's emphasis).  For that reason, the Federal

Defendants argue, the annual average percolation rates expressed in the modeling was sufficient

to allow the BLM to assess the effectiveness of the cover.  *Id*.

Although Carlson stated that the additional modeling would take only four days, other

technical team members felt otherwise.  *See, e.g.,* AR BLM 5579-80 ("could take weeks"); AR

BLM 45655 (based on taking 100 days to run 100 years, it would take 20 days to re-run 20

years).  Rather than engage in additional testing, the Agencies determined that they had sufficient

information with which to assess the potential effectiveness of the cover, that further modeling

would not necessarily provide further useful information, and that collecting empirical data from

a cover design built pursuant to a detailed testing protocol approved by Carlson would be the

preferable alternative.  *See* AR BLM 5722, 5579, 6125.  In the Agencies' view, further modeling

would have provided more information about the model rather than about the performance of the

Cover System.  In other words, "re-running the model studies to report data on a smaller time

scale would simply have indicated when during the year the already-estimated percolation

through the Cover would occur."  *Fed. Defs.' Mem.* at 15.

The Agencies emphasize that Dr. Carlson's concerns were not ignored.  Rather, they were

addressed with a test cell verification program and a cover testing and monitoring program,

Furthermore, the Agencies adopted his recommendation for detailed plans prior to approval.  AR

BLM 6125 and 19533 to 19536.

Simplot describes the various factors taken into account by the modeling:

The agencies' modeling experts' conclusion is confirmed by the

outside cover design and model expert, O'Kane Consultants.  The
VADOSE/W model fully considered seasonal effects.  O'Kane
Dec. ¶ 5.  The model inputs include 100 years of daily temperature
and precipitation data (including time and duration of precipitation
events), wind speed, humidity, and solar radiation. FEIS p. 2-51;
AR BLM 46355.  Vegetative effects on the cover were considered.
The model was run in 1D and 2D, and modeling along a slope was
performed.  FEIS p. 2-51 to 2-52; AR BLM 46320 & 45471.
Because the model includes daily events as inputs, each day of
spring runoff was by definition considered in the model, and was
not "entirely ignored."  AR BLM 46366.  The design specifically
contemplates that "runoff mainly occurs on the proposed expansion
during spring snowmelt. . . .  Once the storage capacity is full (after
May 1st) all additional water applied to the surface must runoff."
O'Kane Dec. ¶ 17; AR BLM 45494;7 *see also* AR BLM 45518
(*showing seasonal effects of the cover in the wettest year on
record—1981*).  What Plaintiffs claim is
missing—seasonality—was in fact examined by the agencies.

The model accounted for effects of freezing and thawing and
burrowing animals. FEIS p. 2-51; AR BLM 45271 & 45283. The
model conservatively over-predicted infiltration by orders of
magnitude to account for those very possibilities.  The record
discloses that all of these issues were considered by the agencies,
subject to a robust internal debate, and ending in a reasoned
decision.

*Simplot Mem.* at 10-11 (emphasis added).

In addition to the test cover design, there was also "extensive site-specific material

testing" to determine the best material with which to construct the cover.  FEIS p. 2-50; AR BLM

45471.  That testing revealed that the Dinwoody material had extremely low permeability and

was an excellent medium for storing water.  FEIS pp. 2-51 to 2-53.  Interestingly, comments

from Plaintiffs on the EE/CA for the Pole Canyon removal action recommended the use of a

water balance store and release cover design that was working well in Montana, in similar

climatic conditions.  AR FS 30951.

**Memorandum Decision and Order - 21**

The Court recognizes that it is not to assume the role of scientist and does not do so. However, it must recognize that the Administrative Record clearly indicates that the cover design went through extensive testing and that the Agencies considered comments, suggestions, and concerns, not only of Carlson, but also of Plaintiffs and others that were raised at various stages of the approval process.[7]  In the end, not one of the members of the technical team objected to the use of the cover.  Even Carlson agreed subject to certain recommendations.  The IDEQ was part of the technical review team and participated in the modeling reviewing potential impacts to water quality.  The IDEQ ultimately concluded that the Mine expansion would not result in violation of either surface or groundwater quality standards.  AR BLM 6528; 6530.  The Court finds it very persuasive that the very agency charged with enforcing water quality standards in Idaho was involved from the beginning of the project, assisted with sampling and interpreting results, evaluated the cover design, and put its stamp of approval on the project  recommending field testing rather than further modeling.   AR BLM 6528-31.  This carries far more weight than concerns raised during this lengthy review process by one member of a 25-member technical review team.  Furthermore, the BLM ROD imposes enforceable two-phased field testing procedure for evaluating the cover's performance prior to final implementation.  BLM ROD at 18-19.

The Court concludes that the Agencies did not act arbitrarily or capriciously in approving

---

[7]  Simplot's  "Timeline of Significant Events in Design of Store and Release Cover" sets forth the extensive communication (with citations to the Administrative Record) between and among Simplot, the Agencies, technical review team members, and independent engineers.  *See Simplot's Reply, Appendix A* (Docket No. 203-2).  Simplot's "Agency Review of Monitoring and Testing Requirements" sets forth (with citations to the Administrative Record) recommendations from Carlson and others regarding the QA/QC program that were incorporated by the Agencies. *See Simplot Reply, Appendix B* (Docket No. 203-3).

**Memorandum Decision and Order - 22**

the cover design without the additional modeling.  They had abundant information on which to

base a reasoned scientific decision that the cover would perform as modeled and built-in field

testing requirements and strict QA/QC conditions.  *See Friends of the Payette v. Horseshoe Bend*

*Hydroelectric Co.*, 988 F.2d 989, 993 (9th Cir. 1993) (concluding that "after-the-fact" monitoring

following review of modeling studies is not arbitrary and capricious).

> ## 2.      CERCLA Remediation at Pole Canyon and Reclamation of Panel E

Plaintiffs challenge the Agencies' decision to rely on Simplot's remediation efforts at

Pole Canyon and reclamation efforts at Panel E to offset selenium impacts from the Mine

expansion when more than 20 miles of area streams have been added to Idaho's CWA § 303(d)

list of impaired waters due to selenium contamination.  *Pls.' Mem.* at 10 (citing FEIS at 3-36, 4-

96; BLM ROD at 16).  They characterize the Agencies' decision as reliance on potential

reductions in the remediation areas to "make room" for any discharges from Panels F and G.  *Id.*

(citing FEIS at 4-96).

Plaintiffs also assert that the Agencies' reliance on Simplot's contractor's conclusion that

Pole Canyon and Panel E were the only sources of selenium contamination – which they contend

the Agencies themselves had characterized as "preliminary" and "one possible interpretation" –

remediation of which would create room for any selenium discharges from the expanded mining

operations, was arbitrary and capricious.  *Pls.' Mem.* at 11.  Their concern is summarized as

follows:

> The possibility that other sources are contributing to the region's
> existing selenium contamination is central to the question of
> whether Simplot's limited remediation efforts at Pole Canyon and
> Panel E alone will sufficiently offset the expanded mine's selenium

> discharges. . . .  Yet, when the agencies rendered their decisions on the mine expansion, Simplot's contractor's analysis was transformed from being "preliminary" and only "possible" in the FEIS to being a certainty that would ensure compliance with Idaho's selenium standard, with nothing in the record to bridge the gap.  *See* BLM ROD at 12 (incorporating FEIS Table 4.3-23 (FEIS at 4-97)).

*Pls.' Mem.* at 12.

The Agencies and Simplot contend that Plaintiffs are again focusing on one phrase in one document in support of their argument.  In their view, to engage in a "fine-grained" analysis of one isolated  comment in the midst of the entire record is not within the purview of the Court's role in conducting an APA review.

Federal Defendants agree that meeting Idaho's ground and surface water quality standards for selenium in South Fork Sage Creek, Sage Creek, and Crow Creek downstream of Sage Creek, already impacted by Simplot's mining operations, depends on the success of the Pole Canyon CERCLA remediation and Panel E reclamation with a new store and release cover.[8]   However, they deny that they rejected the contractor's underlying analysis.  *Fed. Defs.' Mem.* at 21 (citing FEIS Volume II, Appendix 2A pt. 2 at 1).  They cite results of their independent studies that are set forth in the FEIS Appendix 2A, and note that the EPA commented that "The FEIS does a

---

[8]   The full effect of the Pole Canyon remedy will be observable in approximately ten years, realizing that it took approximately ten years for the problem associated with the cross-valley fill to adversely impact the water quality.  AR BLM 5048.  The Agencies predicted it would take over 100 years before peak selenium concentrations would reach the South Fork Sage Springs from Panel F.  When it does reach the Springs, it is projected to be less than 50% of the acceptable water quality standards.  FEIS, p. 4-76, Table 4.3-16, and Figure 4.3-11.  AR FS 16699.  Selenium from Panel F is not predicted to ever reach Hoopes Springs or Pole Canyon Creek.  Panel G will never contribute selenium to any of the listed waters, South Fork Sage Creek, Hoopes Springs, South Fork Sage Spring, or Pole Canyon Creek.  *Id.*  However, Panel G will contribute selenium to Books, Deer Creek, and Crow Creek in approximately 60 to 420 years.  When this occurs, the concentration is estimated to be well below the applicable groundwater standard of 0.05mg/L, with the lowest modeled concentration being 0.0008 and the highest, 0.0037.  *Id.*

good job analyzing scenarios of the potential impacts to water quality for the Preferred

Alternative based on whether or not reclamation activities are successfully completed." AR

BLM 6502 at 2. They recognize that additional investigations might reveal the need for further

remedial actions, but contend that "[t]he available data indicate that Panel E and Pole Canyon are

*significant enough* sources of selenium so that the planned remedy/reclamations will be sufficient

to offset selenium from the expansion." *Fed. Defs.' Mem.* at 21 (emphasis added).

As the Federal Defendants argued at the summary judgment hearing, at the time, the best

information available to the Agencies after a site investigation was conducted was that Pole

Canyon and Panel E were the primary sources of selenium contamination. Plaintiffs have not

asserted that any contrary information was available at the time of the agency action. However,

in the FEIS, the Agencies discussed other possible sources of selenium contamination such as

Panels A, B, C, and D. *See* FEIS at 5-17, *et seq*. Simplot argued at the hearing that the Pole

Canyon diversion had been suggested by Plaintiffs as an appropriate remedy for addressing the

selenium contamination issue. It also noted that once the Pole Canyon run-on controls are

complete, up to 98% of the water will not reach the groundwater under Pole Canyon. *See*

NewField's Draft Mem. AR BLM 05046. Furthermore, the FEIS recognized that addressing

selenium contamination at Pole Canyon and Panel E was only one of several planned remediation

measures.

In conducting an APA review, the Court must determine whether the agencies' decision

is "founded on a rational conclusion between the facts found and the choices made . . . and

whether [the agency] has made a clear error of judgment." *Ariz. Cattle Growers' Ass'n v. U.S.*

*Fish & Wildlife*, 273 F.3d 1229, 1243 (9th Cir. 2001).  The record reflects that the BLM had

volumes of scientific information which identified Pole Canyon and Panel E as major sources of

selenium and concluding that remediation at Pole Canyon and reclamation of Panel E could

reduce the amount of selenium going into the affected waterways.  There was no other

information at the time.  Based on this record, the Court finds that this was a rational conclusion

between the facts found and the decision made.

>   **3.       § 401 Permit**

Plaintiffs contend that the Agencies violated CWA § 401 by authorizing the expansion

without a certification from the Idaho Department of Environmental Quality that "the expanded

Mine's selenium discharges will not violate the state's water quality standards."  *Pls.' Mem.* at

13-14.[9]   Under Section 401 of the CWA:

>   Any applicant for a Federal License or permit to conduct any
>   activity . . . which may result in any discharge into the navigable
>   waters, shall provide the licensing or permitting agency a
>   certification from the State in which the discharge originates or
>   will originate . . . that any such discharge will comply with the
>   applicable provisions of [CWA Section 303 *inter alia*].

33 U.S.C. § 1341(a)(1).

Some commentators to the DEIS questioned why Simplot was not required to obtain an

NPDES permit.  The Agencies responded:

---

[9] In a footnote Simplot contends that Plaintiffs have waived this claim by not presenting it in the administrative process.  Plaintiffs counter that they did raise the Section 401 issue during the administrative process in their July 28, 2008 Forest Service appeal.  AR FS 18297.  Simplot's position is that failure to raise the issue during the notice and comment period is fatal to the claim, citing *North Idaho Community Action Network v. U.S. Depart. of Transportation,* 545 F.3d 1147 (9th Cir. 2008).  The Court has decided to address the merits of the claim rather than deciding the question on the grounds of waiver.

> The seepage from the proposed overburden fill will have no direct connection to surface streams subject to NPDES permitting requirements.  The seepage impacts to surface streams described in the EIS occurred through a pathway where the seepage moved down through the bedrock to the groundwater aquifer and then laterally in the aquifer to points of discharge at area streams.  The overburden fills in this pathway are not hydrologically connected to the surface streams as typically interpreted by the EPA.  Region 10 EPA has commented on the DEIS and did not raise the same concern as the authors of these comments.

FEIS 7-267 to 7-268.

The Federal Defendants' primary response to the § 401 argument is that there has been no "discharge" into the navigable waters.[10]  The Federal Defendants argue that it is not even necessary for the Court to reach the question of  whether the reclaimed pits in Panels F & G are point or nonpoint sources, because in the first instance there is no "discharge."

The CWA does not directly address the issue of discharges to surface waters via hydrologically connected groundwater.  *See, e.g., Idaho Rural Council v. Bosma,* 143 F.Supp. 2d 1169, 1180 (D. Idaho 2001); *Hernandez v. Esso Standard Oil Co.,* 559 F.Supp. 2d 175, 181 (D.P.R. 2009).   However, there is little dispute that if the ground water is hydrologically connected to surface water, it can be subject to 401 certification.  The EPA's interpretation is, "in general, collected or channeled pollutants conveyed to surface water via groundwater can constitute a discharge subject to the Clean Water Act."  66 Fed. Reg. 2960, 3017 (Jan. 12,  2001).   Before a planned activity can be subject to a NPDES permit, there has to be "a direct hydrological connection between groundwater and surface waters."  *Id.*

---

[10]  The Agencies do not dispute that these are "navigable" waters of the United States.  *See Fed. Defs.' Mem.* at 24.

Most of the argument between the parties has centered around whether or not this case involves a "direct" hydrological connection between the new mining pits in Panels F & G and springs which feed Sage Creek and other streams.

The EPA has stated that it is a factual inquiry whether or not there is a direct hydrologic connection between the groundwater and surface water. The time and distance by which a point source discharge is connected to surface waters via hydrologically connected ground waters will be affected by many site specific factors, such as geology, flow, and slope.  The  EPA has not proposed establishing any specific criteria beyond confining the scope of the regulation to discharges to surface water via a "direct" hydrological connection.  As stated in the Federal Register:

> The determination of whether a discharge to ground water in a specific case constitutes an illegal discharge to waters of the U.S. if unpermitted is a fact specific one.  The general jurisdictional determination by EPA that such discharges can be subject to regulation under the CWA is a determination that involves an *ecological*[11] judgment about the relationship between surface waters and groundwaters.  (Emphasis added.)

66 Fed. Reg. at 3018.

The EPA's interpretation is accorded deference.  *United States v. Mead,* 533 U.S. 218, 226-28 (2001); *Skidmore v. Swift,* 323 U.S. 134, 139 (1944); *United States v. W.R. Grace & Co.,* 429 F.3d 1224, 1237 (9th Cir. 2005) (EPA entitled to *Skidmore* deference).

In this case, the Federal Defendants and Simplot argue there is no direct discharge

---

[11]  Ecology is a branch of science concerned with the interrelationship of organisms and their environment. http://www.merriam-webster.com/dictionar/ecology.

because the cover system is designed to absorb the moisture and then release it through evapotranspiration.   The small amount of water that may pass through the hundreds of feet of overburden would then have to pass through hundreds of feet of bedrock and travel underground through different soil and rock formations for between one to four miles until reaching the surface water.   The modeling predicted that it would take between 60 and 420 years for peak concentrations of selenium to arrive at the surface waters, and even then they are projected to be substantially below the water quality standards set by the IDEQ.[12]   Plaintiffs strongly argue that the FEIS and comments from EPA suggest that there is a direct hydrological setting at the Mine between groundwater and surface water and which has been described as "unique."   They also cite comments from EPA regarding the "groundwater and interconnected surface water."  EPA FEIS Comments (AR BLM 6502) at 2.

The Court views this as a scientific difference of views between the parties.  Plaintiffs' position that there is a "direct" connection is not a baseless argument, just as the Agencies' position that there is no direct hydrologic connection between what seeps out of the bottom of a pit and what shows up, in some cases hundreds of years later, at a distant location.

As the cases cited above suggest, when the Court is charged with trying to ascertain whether the Agencies acted in an arbitrary manner in making an ecological determination, it should be left in the first instance to the discretion of the Agencies.  Put another way, there

---

[12]   Plaintiffs correctly point out that there is a potential for ground water containing selenium to flow out of Pit E-O and arrive at surface water in a much shorter period of time.  However, the question here is not whether a 401 certification should have been obtained years ago when this pit was mined because of geological features unique to this pit, but whether the BLM acted in an arbitrary manner in deciding that no 401 certification was needed when doing the FESI for expansion into Panels F & G.

**Memorandum Decision and Order - 29**

appears in the FEIS a rational basis between the facts found, i.e. there was no *direct* hydrological connection between the ground water and the surface water, and the decision made, that no 401 certification from the State of Idaho was needed.   The Court cannot find that the Agencies, "entirely failed to consider an important aspect of the problem" or offered an explanation "that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference of view or the product of agency expertise." *Lands Council v. McNair,* 537 F.3d 981, 987 (9th Cir. 2008) (en banc).

The finding that a rational basis exists for the Agencies' decision that a 401 certification was not required rests to some degree on the involvement of both the IDEQ and the EPA in this process.  These are the two agencies most familiar with 401 certifications and when they would be required.  At no point in reviewing this project did the EPA suggest that a 401 certification was necessary.  Also, when a 401 certification was needed for part of the project, it was required from Simplot.

As noted above, the IDEQ was involved from the beginning as a cooperating agency and agreed that the project would comply with Idaho surface water quality and ground water standards.  In a letter dated January 31, 2008, IDEQ stated that phosphate mining was a nonpoint source activity under its regulations, and the Idaho Water Quality Standards relied on best management practices to avoid any violations of water quality standards.  AR BLM 006528 to 006531.  If there is a violation of the criteria and the activity is not conducted in accordance with BMP, the State of Idaho retains the authority to institute civil or administrative enforcement proceedings.  Regarding mining and groundwater, Idaho's policy is to protect groundwater and

allow for mining activities, again through the use of best management practices and monitoring.

*Id.*

The January 31, 2008 letter did address concerns about the water quality in Sage Creek

from historic selenium pollution and sediment in North and South Fork Deer Creek.  The IDEQ

concluded:

> Until the waters are removed from the [303(d)] list the water
> quality standards require, for medium to low priority water bodies
> such as Sage and Deer creeks, that BMP will be implemented to
> limit selenium, sediment and other pollutant impacts from roads
> and other activities associated with the mine.  According to the
> Final Environmental Impact Statement (FEIS), with the use of
> these BMPs, it is predicted that there will be no violation of the
> water quality criteria applicable to surface waters in the area and
> there will be no impact on the support status of these streams,
> including Sage and Deer creeks.  Therefore, the mine expansion
> appears to be consistent with the applicable provisions of the state
> WQS.

AR BLM 006529.

Simplot joins the arguments of the Agencies that there is no discharge but also advances

the argument that the reclaimed pits in the Mine panels are not "point sources".  The 401 permit

requirements are based on discharge of pollutants from "point sources."  A point source is

defined as "a discernible, confined and discrete conveyance . . . from which pollutants are or may

be discharged." 33 U.S.C. § 1362(14).   Another section of the CWA discusses nonpoint

sources, which encompass "mining activities, including runoff and siltation from new currently

operating, and abandoned surface and underground mines." 33 U.S.C. § 1314(f)(2)(B).[13]  These

---

[13]  Idaho Code § 39-3602(16) defines nonpoint source activity to include mining and run off from storms
and other weather related events.

specified activities are not subject to NPDES permit requirements; rather, the CWA directs the Administrator to develop guidelines for identifying and controlling such sources.

Simplot argues that if Plaintiffs' position were accepted, then any time precipitation infiltrates a mine site to groundwater, no matter at what rate, no matter by what mechanism, then every mine is a point source. Simplot also attacks Plaintiffs' position that the reclaimed pit itself is a "point source." In Simplot's view, the cover and reclaimed pit do not convey water in a discrete conveyance like a pipe or conduit. Instead, it sheds water to a storm water collection system which is covered by a permit and an existing 401 certification. Unsaturated flow through a cover, through hundreds of feet of overburden, and then through hundreds of feet of bedrock to an aquifer, in Simplot's view would not be a "discernible, confined and discrete conveyance." 33 U.S.C. § 1362(14). The CWA includes examples of such conveyances, including "any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft." *Id.*

The Ninth Circuit has held that "runoff caused primarily by rainfall around an activity that employs or creates pollutants" cannot be traced to any identifiable point of discharge and is therefore is a nonpoint source. *Trustees for Alaska v. EPA*, 749 F.2d 549, 558 (9th Cir. 1984). However, the Ninth Circuit agreed with an earlier decision from the Tenth Circuit, *United States v. Earth Sciences, Inc.,* 599 F.2d 368 (10th Cir. 1978) which found that underground seepage from a sump pit which held toxic leachate solution and reached a nearby river, would be a release from a discernible conveyance, and was subject to NPDES regulation as would be all point sources. The Ninth Circuit then held that releases from sluice boxes would be a point source

requiring a permit.  *Id.* at 558.

Simplot states Plaintiffs' argument that a § 401 certification was required is  factually and legally incorrect.  Simplot points out that the Mine has several 401 certifications, received a 404 permit for the stream crossing from the Corps of Engineers, received a 401 certification from the State of Idaho, the entire Mine is subject to an NPDES multi-sector general storm water permit, and the multi-sector general permit received a 401 certification from the State of Idaho in December 2000.   A new MSGP was promulgated in 2008 and the IDEQ certified this permit under 401 in December 2008.   The Agencies and the EPA determined that there were no waste streams not covered by the permit.  However, the Court agrees with Plaintiffs' response.  The fact that Simplot has other permits does not obviate the need for a 401 certification for expansion into Panel F & G, if in fact one was required.

This has been one of the more difficult issues for the Court to decide.  Plaintiffs have made some very good arguments concerning the interrelationship between groundwater and surface water in this case.  But as Simplot and the Federal Defendants point out, and Plaintiffs do not dispute, none of the phosphate mines in Southeast Idaho have a 401 certification that would cover precipitation that would fall on a reclaimed mining pit, eventually reach ground water and manifest itself many years later at a distant surface water location.  If this is a type of "direct" hydrologically connection that would require a permit, then such a decision would not only impact similar mining operations in Idaho, but also potentially across the United States.

The flip side of a "direct" hydrological connection would be a "indirect" connection to surface water, that logically would not be regulated by the EPA under the CWA.  While many

cases have been cited to the Court, there has been no case cited, where based on similar geological facts, a 401 certification has been required. The EPA never took the position that one was required in this case, and it is suggested by the Federal Defendants that this has been their practice nationwide. How an agency interprets its regulations, enforces its policies and construes its prior practices is entitled to deference. *See, e.g., Coeur Alaska, Inc., v. Southeast Alaska Conservation Council,* 129 S.Ct. 2458 (2009). The Court can also envision future monitoring and enforcement issues. How do you accurately decide if the contamination originated from this source, or perhaps another source, sixty years or four hundred years later. For these reasons, the Court will defer to the Agencies' decision that a certification was not required in this case.

### B.     National Forest Management Act

The Forest Service developed the Revised Forest Plan for the Caribou National Forest ("RFP") in February 2003, a copy of which was submitted with the Complaint. *See* Docket No. 18-9. According to the RFP, mines are to be in compliance with applicable state and/or federal surface and groundwater regulatory standards. AR BLM 43325 (Stnd. 1). Furthermore, any new proposed management activities within watersheds containing 303(d) listed waterbodies are to improve or maintain overall progress toward beneficial use attainment for pollutants which led to listing. *Id.* Finally, phosphate mining overburden and soil materials are to be managed according to state-of-the-art protocols to help prevent the release of hazardous substances in excess of state and/or federal regulatory standards. AR BLM 43358 (Stnd. 4).[14]

---

[14]     The Court notes that the RFP specifically allows for the exploration and development of existing phosphate mine leases. *See generally* RFP Prescription 8.2.2(g) at 4-82, *et seq.* The Guidelines to that Prescription specify that "[n]ew information from the Selenium-wide Advisory Group and other sources should be incorporated

Plaintiffs claim the Agencies have not complied with NFMA because (1) they have not complied with CWA water quality standards,  and (2) they have not complied with NFMA's requirement that the plan provide for diversity of plants and animals pursuant to 16 U.S.C. § 1604(g)(3)(B) by designating any indicator species for a number of sensitive habitats including those that face "severe threats" from the Mine expansion.  *Pls.' Mem.* at 26-27.

### 1.      CWA -- Water Quality Standards

Plaintiffs assert essentially the same CWA violations in support of its claim that the agencies violated NFMA, 16 U.S.C. § 1604(i), which requires agencies to "ensure that new proposed management activities within watersheds containing § 303(d) listed waterbodies improve or maintain overall progress toward beneficial use attainment for pollutants which led to the listing."  AR BLM 43325 (Forest Plan, Stnd 1).  They further assert that at phosphate mines in particular, the Agencies violated the standard that "[o]verburden and soil materials shall be managed according to state-of-the-art protocols to help prevent the release of hazardous substances in excess of state and/or federal regulatory standards."  *Id.* at 43358 (Stnd 4).

As showed above, the Agencies have complied with the CWA,  Thus, they have necessarily complied with the NFMA requirements.

### 2.      Management Indicator Species

Plaintiffs claim that the Forest Service violated NFMA by failing to designate and address the needs of management indicator species (MIS) in its revised plan and that because the revised

as it becomes available.  Existing plans and future proposals should be consistent with the most current science and research."  RFP at 4-84 (Guideline 1).

plan violates NFMA, the decision approving the expansion of the Mine is also unlawful.  *Pls.'*

*Mem.* at 31.  More specifically, Plaintiffs claim that the revised plan violates NFMA because it

does not designate MIS for aspen, tall forb, and riparian habitats.  Rather, it designates only three

habitats requiring naming of an MIS: grassland and open canopy sagebrush (Columbian sharp-

tailed grouse), sagebrush (sage grouse), and mature and old forest structure (goshawk).[15]  AR FS

200091.

      The Forest Service contends that there is no requirement that a minimum number of MIS

be selected or that an MIS be selected for any or all major biological communities, forest or

vegetation types, or other types of wildlife habitat in the planning area.  *Fed. Defs. Mem.* at 41-

42.  It further contends that its detailed rationale for eliminating MIS for tall forbs, riparian, and

aspen habitats based on agency expertise is entitled to deference.  *Id*. at 43-44.

      Under NFMA, the Secretary of Agriculture is required to promulgate regulations, among

other things,

> (3) specifying guidelines for land management plans developed to
> achieve the goals of the Program which . . .
>
> (D) provide for diversity of plant and animal communities based on
> the suitability and capability of the specific land area in order to
> meet overall multiple-use objectives, and within the multiple-use
> objectives of a land management plan adopted pursuant to this
> section, provide, where appropriate, to the degree practicable, for
> steps to be taken to preserve the diversity of tree species similar to
> that existing in the region controlled by the plan . . . .

---

[15]  Prior to the 2003 revision, the following habitats and MIS were included: Snags, riparian by rivers and lakes (bald eagle); early forest succession, mountain brush, sage-grass (mule deer and elk); old growth conifer (goshawk); snags, old or decadent conifer and aspen (hairy woodpecker); aspen and riparian (yellow-bellied (red-naped sapsucker); sage grass (sage grouse).  AR FS 020086.

**Memorandum Decision and Order - 36**

16 U.S.C. § 1604(g)(3)(B).

 Among those regulations is the following at issue here:

> In order to estimate the effects of each alternative on fish and wildlife populations, certain vertebrate and/or invertebrate species present in the area shall be identified and selected as management indicator species and the reasons for their selection shall be stated. *These species shall be selected because their population changes are believed to indicate the effects of management activities*. In the selection of management indicator species, the following categories shall be represented *where appropriate*. . . .

36 C.F.R. § 219.19(a)(1) (2000).[16]

 Plaintiffs contend that since "the plan designated only three MIS for the entire 1.1-million acre forest," it violated NFMA. *Pls'. Mem.* at 29. They rely primarily on *Utah Environmental Congress v. Richmond*, 2006 WL 325375 (D. Utah Feb. 10, 2006), *aff'd in part, rev'd in part on other grounds*, 483 F.3D 1127 (10th Cir. 2007), in which the district court found that the Ashley revised plan that reduced the number of indicator species from twelve to two violated the NFMA. *Id*. at *2, *8. The Utah District Court found that while the method used by the Forest Service in selecting MIS was not improper, the result reached could not be sustained. The Utah District Court concluded that when the Forest Service had identified only two MIS for the entire forest, it

---

  [16] The regulations outlining the purpose of MIS and the manner in which MIS should be identified and monitored have been substantially altered over the past years. The 1982 regulations were effectively repealed by regulations issued in 2000. See 65 Fed.Reg. 67,568 (Nov. 9, 2000). Those regulations called upon responsible officials to consider the "best available science" when considering the approval of management activities. See 36 C.F.R. § 219.35(a) (2000). The 2000 regulations also provided for a transition period, giving responsible officials the option of proceeding with qualifying proposed actions under either the 1982 rule or the new rule. See id. § 219.35(b). The transition period ended when the Department of Agriculture issued a final rule in 2005. See 70 Fed.Reg. 1023 (Jan. 5, 2005). The new rule does not require monitoring of MIS. See *id.*. at 1048 ("The concept of MIS was not included in the 2002 proposed rule and is not in the final rule ... because recent scientific evidence identified flaws in the MIS concept."). The 1982 regulations last appeared in the Code of Federal Regulations in 2000. *See* 65 Fed. Reg. 67,514, 67,568 (Nov. 9, 2000).

**Memorandum Decision and Order - 37**

effectively crippled the Forest Service's obligation to comply with its monitoring obligations. 2006 WL 325275, at *8.

The decision by the Utah District Court cited a few comments by the Forest Service from the MIS Amendment and the EA explaining why they concluded that two MIS would be sufficient for the Ashley Forest.  However, it is almost impossible for this Court to evaluate from these few comments the reasoning and scientific basis used by the Forest Service in Ashley Forest and compare it with the decision-making process used in this case.  The Utah District Court had its administrative record to review, and this Court has its administrative record to review.  While this Court does not take issue with some of the general observations made in the decision from Utah, this Court is charged with examining the record before it to determine if there has been statutory and regulatory compliance by the Forest Service in selecting MIS in the Caribou Forest Plan.

A detailed explanation of the reasoning behind the changes between the 1985 Caribou Forest Plan and 2003 revised plan is contained in the Administrative Record at FS 020086-020094.  The Court will provide a brief summary of that process.

The Forest Service first discussed the reasons behind the last forest planning process in 1985.  Originally the MIS were chosen because the species had habitat requirements similar to other species for which it could serve as a biological barometer for the well being of a specific habitat.  Threatened and endangered species were automatically included as MIS.  *Id.*

In discussing the current situation, the Forest Service noted that many of the MIS were not effective as MIS because they did not meet the criteria for selection.  For example, Bald

Eagles (there were only two known nesting areas) were not widespread across the Forest.  Mule

deer and elk are habitat generalists, migratory and did not show direct responses to changes in

habitat.  Hairy woodpeckers are also forest generalists, using a wide variety of forest types and

habitat components.   The Forest Service concluded that MIS should be chosen for specific

habitats identified as being at risk; however, it acknowledged that several would not have an

MIS.  The Forest Service found that monitoring of vegetation structure, composition and

distribution would be more effective for those habitats.

Plaintiffs criticize the Forest Service's decision that some high risk areas will use habitat

monitoring, without any assessment of how much and what quality of habitat is necessary to

support the needs of any associated species since this would not satisfy NFMA's wildlife

requirements.  But in the Court's view, the Forest Service should not just be selecting species as

MIS just for the sake of having made such a designation, if sound reasons exist in the record why

a MIS would not be "appropriate"  in the forest setting being examined under 36 C.F.R.

§ 219.19(a)(1) and that direct monitoring would be more beneficial.  Support for this is found in

*Inland Empire Public Lands Council v. U. S. Forest Service,* 88 F.3d 754 (9th Cir. 1996).  While

not directly on point, the Ninth Circuit commented:

> Plaintiffs contend that we must still reverse because the Service did
> not comply with its duties regarding the "management indicator
> species."  Regulation 219.19 provides that the Service *may* select
> "certain vertebrate and/or invertebrate species present in the area"
> to be "management indicator species" when those species'
> "population changes *are believed to indicate the effects* of
> management activities."  36 C.F.R. § 219.19.  Once an indicator
> species is selected, the Service is obligated to evaluate planning
> alternatives for projects that affect that species "in terms of both

> amount and quality of habitat and of animal population trends of
> the management indicator species."  36 C.F.R. § 219.19(a)(2)
> (emphasis added).

*Id*. at 762.

The Court will now briefly review the process used here to determine if it was

"appropriate' not to designate MIS for certain habitats.

Using protocols developed after the 1985 Caribou Forest Plan, the Forest Service

discussed the nine key steps in selecting a MIS.  AR FS 020087.   It next looked at the Caribou

Proper Functioning Condition Assessment done in 1997 to identify systems at risk of not proper

functioning.  It also looked at Idaho Partners in flight which identified as priorities four areas that

provided moderate to good protection from degradation, one of which was not located on the

Caribou National Forest.  The Interior Columbia Basin study was also used as a cross-check on

habitats that were in decline, which led to the identification of ten habitats at risk in the Caribou

National Forest.  However, as to the habitats at risk, it was decided that six would not have

management indicator species identified for monitoring.  For example, Juniper was found on

only two percent of the Forest.  Non-riverine wetland were a minor component of the Forest and

would be monitored under another program.  The tall forb was identified as being at high risk,

but the sites had been highly modified by historic sheep grazing and were so few in number that

it was not even known "if there [were] any left." AR FS 020090.  In addition, no bird groups

were strongly associated with this vegetation type.

While beavers were initially suggested as a MIS in the Draft Revised Plan for riparian

areas, it was decided that it would not be possible to monitor the population trends and relate

them to forest management.  The red-naped sapsucker was currently a MIS for the Caribou Forest Plan in Aspen areas, but it was decided that because it was such a widespread species, changes in abundance would be very difficult to correlate and it would be more effective to monitor Aspen rather than a particular species. *Id.*

Also, the Court finds it significant that the Forest Service did not arbitrarily just delete management species and leave it at that.  While some were deleted for the reasons discussed above, the Forest Service added  the Columbian Sharp-tailed grouse as a MIS for grassland and open canopy sagebrush.

The analysis concluded with a comparison with adjacent national forests, and an explanation of why some of the MIS used in those forests were not appropriate in the Caribou National Forest.  For example, some of these species were not found in the Caribou, others were very difficult to monitor and that a selected MIS, such as the goshawk, would provide similar habitat monitoring.

When determining if an MIS would be appropriate, it was proper for the Forest Service to draw on its 15 plus years of working with the 1985 Caribou Forest Plan.  Plaintiffs challenge the lack of selection of MIS for aspen, tall forbs and riparian areas, but do not dispute the findings made by the Forest Service in revising the MIS that there were no appropriate species that could serve as MIS for these areas.

In conclusion, the Court must give weight to the regulation that requires a MIS only if a species' population changes are believed to indicate the effects of management activities and is "appropriate."  The Forest Service, for the reasons discussed above, did not find as to certain

areas that it would be appropriate to designate an MIS and found that habitat monitoring would

be more effective.  When reviewing an agency's decision, the Ninth Circuit directs that proper

deference be given to such decisions, "Granting the Forest Service the latitude to decide how best

to demonstrate that its plans will provide for wildlife viability comports with our reluctance to

require an agency to show us, by any particular means, that it has met the requirements of the

NFMA every time it proposes action." *McNair,* 537 F.3d at 992.   It was also noted, "Thus, we

defer to the Forest Service as to what evidence is, or is not, necessary to support wildlife viability

analyses.  Were we to grant less deference to the agency, we would be ignoring the APA's

arbitrary and capricious standard of review."  *Id.* at 992.

　　　Since the Court finds here that the decision not to select MIS for certain habitats in the

Caribou National Forest was not arbitrary or capricious, it follows that the Forest Service's

approval of the expansion of the Smoky Canyon Mine was not unlawful.

## C.　　Mineral Leasing Act

　　　Plaintiffs contend that the Mineral Leasing Act, 30 U.S.C. §§ 181, *et seq.*, only allows

leases where the applicant can show a "valuable deposit" and that it is economically feasible to

mine the deposit in light of likely mitigation and remediation costs.[17]   Plaintiffs therefore assert

the decision to modify the Panel F lease, a 120-acre modification to the North and a 400-acre

modification to the South, was unlawful.

　　　Plaintiffs assert that the BLM could not rationally decide that allowing the expansion

---

[17]   To the extent Plaintiffs argue that any modification of the lease would also be unlawful under the MLA
on the grounds that it would violate the governing water quality standard, the argument would be moot under the
Court's previous discussion under the CWA.

**Memorandum Decision and Order - 42**

would provide an economical and efficient recovery of phosphate without first rationally determining that water quality standards would not be violated.  They contend that since BLM did not rationally make the first decision that there would be no contamination, it erred in not factoring in the major expenses of cleaning up the selenium pollution.  According to Plaintiffs, once the huge remedial costs are factored into the equation, the expansion becomes uneconomical for Simplot to pursue.  For that reason, Plaintiffs conclude that BLM's approval violated the MLA and should be set aside.

Plaintiffs' argument is premised on the provision in the MLA that phosphate leasing is authorized only where a permittee demonstrates that "valuable deposits of phosphate" have been discovered in the area covered by his permit.  *See* 30 U.S.C. § 211(b).  "Valuable deposit" is defined in the applicable regulations as "an occurrence of minerals of such character that a person of ordinary prudence would be justified in the further expenditure of his or her labor and means, with a reasonable prospect of success in developing a profitable mine."  43 C.F.R. § 3501.5.  Plaintiffs contend that a lease applicant must include the costs of likely mitigation and remediation in demonstrating that it is economically feasible.  *Pls.' Mem.* at 15 (citing *Kerr-McGee Corp. v. Hodel*, 630 F.Supp. 621, 629 (D.D.C. 1986) (affirming denial of phosphate leases to companies that failed "to show the economic and technological feasibility of reclaiming the lands covered by the lease application"), *vacated as moot*, 840 F.2d 68 (D.C.Cir. 1988)).

As the Federal Defendants and Simplot point out, and as is readily apparent from reviewing the stated authority, by its terms, § 211(b) is applicable to prospecting permits which are issued to an applicant wishing to determine whether phosphate deposits exist in an

unclaimed, undeveloped area.  *See* 30 U.S.C. § 211(b).   That subsection provides that a

permittee is entitled to a lease of the area if the permittee shows that the area contains *valuable*

*deposits* of phosphate.  *Id*. (emphasis added).  *See also* 43 C.F.R. § 3501.10(a) ("Prospecting

permits" let you explore for leaseable mineral deposits on lands where BLM has determined that

prospecting is needed to determine the existence of a *valuable deposit*.") (emphasis added); 43

C.F.R. § 3505.10 ("A prospecting permit gives you the exclusive right to prospect on and explore

lands available for leasing under this part to determine of a *valuable deposit* exists of . . .

phosphate.") (emphasis added).

    At issue here, on the other hand, is a modification to the lease of Panel F.  Subsection

211(a) authorizes leasing of phosphate deposits of the United States through, *inter alia*,

competitive bidding "when in [the Secretary of the Interior's] judgment the public interest will be

best served thereby."  30 U.S.C. § 211(a).  "'Competitive leases' are issued by competitive

bidding for *known deposits* of a leasable mineral."  43 C.F.R.§ 3501.10(d).  "'Lease

modifications' add adjacent acreage to a Federal lease [where] the acreage to be added . . .

contains known deposits of the same mineral that can be mined only as part of the mining

operation on the original Federal lease. . . ."  43 C.F.R. § 3501.10(f).   Even though the subject

adjacent lands have known mineral deposits, they may be leased noncompetitively.  43 C.F.R.

§ 3510.11.  A lease will be issued or modified only when certain conditions are met.  43 C.F.R.

§ 3510.15.  One such condition is that "[l]easing the lands will conserve natural resources and

will provide for economical and efficient recovery as part of a mining unit."  43 C.F.R.

§ 3510.15(f).

Simplot's lease of Panel F was obtained in January 2001 through the competitive leasing process required by § 211(a) to mine phosphate in an known phosphate leasing area.  AR BLM 707-14.  Nowhere in the applicable statute or its implementing regulations is there a requirement that a "valuable deposit" of phosphate exists.  *Kerr-McGee*, a lone district court case, was construing the meaning of the term "valuable deposit" as used in § 211(b) and was addressing reclamation, not remediation, costs.  Therefore, neither § 211(b) not *Kerr-McGee* is applicable.

The Court recognizes that Plaintiffs appear to be equating "valuable deposit" in § 211(b) with "economical and efficient" in § 3510.15(f).  However, given the difference in terms, the Court cannot assume that *Kerr-McGee* is applicable.

The Court agrees with the Federal Defendants that Plaintiffs' MLA claim is "based on a hypothetical future violation of CERCLA" and the failure to consider the costs "of an equally hypothetical cleanup."  *Fed. Defs.' Mem.* at 45.  While there is some basis for estimating *reclamation* costs taking into consideration such factors as the number of acres disturbed and the materials with which they will be restored or roads removed, *remediation* costs are more nebulous.  There simply is no certainty with which to predict how much, if any, remediation would be required from operations resulting solely from mining of the deposits under the area incorporated by the modification.  Furthermore, there appears to be no requirement that the cost of remediating any existing selenium contamination from the existing mining operations should be considered when modifying the lease.  Nowhere in the statute, the regulations, or in case law submitted by Plaintiffs is there a requirement that the Agencies assume that the project will violate water quality standards resulting in possible CERCLA-type remediation.  Nevertheless,

the FEIS did address water quality impacts of the lease modification areas.  *See* FEIS 4-61-62; 4-66-67; 4-87-91; 4-93-95.  The Administrative Record also contains a memorandum and geological report evidencing that the BLM considered water quality issues related to the lease modification.  *See* AR 590-91; 592-613.

**E.     National Environmental Policy Act ("NEPA")**

Plaintiffs contend that the Agencies acted arbitrarily by:  (1) approving the expansion of Smoky Canyon Mine with an inadequate FEIS that failed to assess the impact of seasonal precipitation on Simplot's store and release cover design, (2) failing to include the additional four days of modeling runs needed to assess the cover's seasonal performance, (3) relying on a "test while mining" scheme under which critical issues regarding the impact of Simplot's expanded operation will be assessed as Simplot expands the Mine, (4) failing to address the uncertainty regarding the sources of the selenium contamination currently in the nearby streams, and (5) failing to define and assess whatever "adaptive" mitigation measures might be taken should the Smoky Canyon Mine expansion result in increased selenium contamination.

As stated above, the main thrust of NEPA is to ensure, through certain procedural requirements, that agencies consider and take a hard look at detailed information about significant environmental impacts of a proposed action and make that information available to the public for comment.

**Memorandum Decision and Order - 46**

Procedural requirements under NEPA and its regulations include a scoping process to determine whether an environmental impact statement is necessary, scientific analysis, expert agency comments, public involvement, discussion of significant environmental impacts, and information regarding reasonable alternatives to the proposed action. *See generally* 40 C.F.R. §§ 1500.1; 1502.1.  If an agency determines an EIS is necessary, the regulations require it to provide a DEIS which must disclose and discuss all major points of view on the environmental impact of alternatives to the proposed action as well as the proposed action itself.  40 C.F.R. § 1502.9.  After a public comment period, the agency must complete a FEIS responding to comments solicited and  received from certain federal agencies, appropriate state and local agencies authorized to develop and enforce environmental standards, Indian tribes where necessary, the applicant, and the public.  40 C.F.R. § 1503.1.  The FEIS must respond to the comments using one of the options specified in the regulations and attach all substantive comments or summaries thereof.  40 C.F.R. § 1503.4.

The Administrative Record reflects that the Agencies here observed the procedural requirements from scoping through the FEIS.   Throughout the process, they held public meetings, reviewed and responded to public comment, assembled a multi-agency team of technical specialists, engaged in extensive water quality and geological monitoring and research, extensively tested the cover design, consulted with independent experts, and ultimately approved the Mine expansion subject to strict QA/QC monitoring requirements, violation of which results in termination of mining operations until violations are addressed.  Indeed, the Agencies incorporated two significant suggestions of Plaintiffs –  the cover design and the Pole Canyon

diversion –  as well as the Carlson's suggestions.  The Agencies then sought comment on the

FEIS before issuing their respective RODs approving the expansion.

As most recently stated by the Ninth Circuit, by way of adopting the district court's order

denying the plaintiffs' motion for summary judgment, the Court's "extremely limited" review of

an environmental impact statement ("EIS") includes simply making a determination of whether

an EIS contains a "reasonably thorough discussion" of "probable environmental consequences"

of a proposed action as opposed to making a "fly-speck" review.  *River Runners for Wilderness*

*v. Martin*, ___ F.3d ___, 2009 WL 2151356 at *19 (9th Cir. July 21, 2009).  The Agencies' FEIS

unquestionably meets that standard.  They took the oft-cited requisite hard look at all aspects of

the effects of the Mine expansion on the environment.  *See Northwest Environmental Advocates*

*v. National Marine Fisheries Service*, 460 F.3d 1125 (9th Cir. 2006).  As the FEIS did in *River*

*Runners*, the FEIS  here contains hundreds of pages of technical and scientific references.  As in

*Northwest Environmental Advocates*, the Agencies did not remain with the initially proposed

action but rather consulted with independent experts and responded to comments and concerns

from stakeholders.

As it did in its Order denying the preliminary injunction motion, the Court finds the

language of the Ninth Circuit in *Northwest Env. Adv.* particularly apt:

> It is not the office of this court to pass upon the wisdom of an
> agency action or to require an agency to study a proposed action *ad*
> *infinitum*. Our role is simply to assure that the agency has taken a
> hard look at the proposed action. In this case, the Corps has
> demonstrated the hard look by performing exhaustive studies over
> numerous years, soliciting and accommodating input from
> stakeholders, and thoroughly re-analyzing areas of particular

concern.

*Northwest Env. Adv.*, 460 F.3d at 1145.

The Agencies here likewise performed exhaustive studies over several years soliciting comments, including Plaintiffs', and re-analyzed areas of their stated concerns.  Accordingly, the Court finds that the Agencies did not violate NEPA.

      **F.**     **Supplemental Environmental Impact Statement**

Agencies are required to prepare a supplemental environmental impact statement ("SEIS") in certain circumstances and permitted to in others.  *See* 40 C.F.R. § 1502.9.   Agencies are required to prepared an SEIS if:

> (i) The Agency makes substantial changes in the proposed action that are relevant to environmental concerns; or
>
> (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

40 C.F.R. § 1502.9(c)(1).

Plaintiffs argue that both conditions were met requiring an SEIS.  More specifically, they argue that the Agencies violated NEPA when they issued their FEIS and RODs without first preparing an SEIS evaluating the cover design and environmental information that they argue only emerged after public and agency comment on the Agencies' DEIS had been concluded. *Pls.' Mem*. at 25.   Plaintiffs state that the FEIS declared for the first time that Simplot's expanded operation would fully comply with Idaho's water quality requirements due in part to Simplot's use of Deep Dinwoody cover design.  This alone in Plaintiffs' view was enough to

trigger the preparation of an SEIS.  Also, the FEIS included thousands of pages of new

information relevant to environmental concerns, including assessments of Simplot's cover

design, the Agencies' new attenuation assumptions, and multiple new appendices.  *Id*. at 26

(citing FEIS at 2-48 through 57).  Plaintiffs assert they were denied the opportunity to comment

on the "reams" of new information unveiled late in the NEPA process.

The Federal Defendants and Simplot have responded by pointing out that there was not a

drastic change from the DEIS and the FEIS.  Both documents discussed the need for a cover

design.  The DEIS discussed one variation, the low permeability shingle cover, as Alternative D

and explained why it was not a preferred alternative.  The FEIS, after two more years of study

and modeling returned to a variation of Alternative D, not a low permeability cover, but a store

and release cover.   Both covers employed the use of Dinwoody, chert and topsoil, but in

different configurations.  The Federal Defendants point out that Plaintiffs submitted 78 pages of

comments on the DEIS, plus 425 pages of appendices, for a total of 503 pages.  *Fed. Defs.' Mem.*

at 38 (citing AR BLM  10563-11066).  These in turn generated 502 separate comments in the

FEIS.  *Fed. Defs.' Mem.* at 39 (citing AR BLM 19016-400).   In addition, Plaintiffs submitted

comments on the FEIS.  AR FS 13196.

The Supreme Court has stated:

> [A]n agency need not supplement an EIS every time new
> information comes to light after the EIS is finalized. To require
> otherwise would render agency decision-making intractable,
> always awaiting updated information only to find the new
> information outdated by the time a decision is made.

*Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 370 (1989).

In *Westlands Water Dist. v. U.S. Dept. of Interior*, 376 F.3d 853 (9th Cir. 2004), the Ninth Circuit discussed whether a biological opinion released after a DEIS, mandated an SEIS rather than an FEIS.  The Court held that the information in the biological opinion was adequately addressed in the FEIS.  "When new information emerges after the circulation and public comment period of the DEIS, it may be validly included in the FEIS without recirculation." *Id.* at 873 (citing *Marsh,* supra).  As the Ninth Circuit has observed, "it is not uncommon for changes to be made in a FEIS after receipt of comments on a DEIS and further concurrent study." *Kootenai Tribe of Idaho v. Veneman,* 313 F.3d 1094, 1118 (9th Cir. 2002) (further noting that the public had the right to comment after publication of the FEIS, and upholding the addition of 4.2 million acres not included in the DEIS but included at the FEIS stage).  Changes in a project that "would not significantly impact the environment in a way not previously considered" do not require an SEIS.  *North Idaho Community Action Network v. U.S. Dept. of Transp.*, 545 F.3d 1147, 1157 (9th Cir. 2008) (citing *Marsh, supra,* and *Westland Water Dist.*, *supra*).

"[A]gencies must have some flexibility to modify alternatives canvassed in the draft EIS to reflect public input without having to circulate a supplemental draft EIS describing the proposed action . . . or agencies as a practical matter may become hostile to modifying the alternatives to be responsive to earlier public comment."  *California v. Block,* 690 F.3d 753, 770 (9th Cir. 1982).  *See also Half Moon Bay Fishermans' Ass'n v. Carlucci,* 857 F.2d 505, 508-09 (9th Cir. 1988) (citing *California v.Block*).  On the other hand a draft should be re-circulated "if the Proposed Action ultimately differs so dramatically from the alternatives canvassed in the draft EIS as to preclude 'meaningful consideration' by the public. . . ."  *Id.* at 770.

Here, the Agencies thoroughly addressed the changes between the draft and final analysis in the FEIS, including changes in the cover design and additional surface water, fisheries, and selenium data, and concluded that the new data did not change its predictions about impact. FEIS at 1-24-26.  Significantly, this analysis included evaluation of information provided by the Greater Yellowstone Coalition.  *Id*. at 1-24.  The agencies explained that changes in the cover design "were within the scope of the impacts displayed in the DEIS and therefore do not constitute a significant change . . . ."  FEIS at 1-26.  The Agencies stated that the "design of the cover in this FEIS [are] generally equivalent to that described in the DEIS in purpose, extent, and materials of construction." *Id*.

The Court finds that the Agencies appropriately revised the draft based on comments and further information and included the additional analysis in the FEIS.  Neither the impacts nor the alternatives changed significantly from the draft EIS to the FEIS, and the Agencies therefore reasonably concluded that a supplement was not necessary.  Therefore, the legal standards have been met in this case and an supplemental environmental impact statement was not necessary.

## CONCLUSION

The NEPA process worked here as it was designed to work.  Plaintiffs, the public, and other state and federal agencies had the opportunity to comment on the Mine expansion.  As a result of those comments and the Agencies' response, the ultimate action is more protective of the environment than it would have been without the process.  With the stringent monitoring requirements and safeguards in place, expansion of the Smoky Canyon Mine 800 yards from its existing Mine into an adjacent portion of the known phosphate leasing area of southeastern Idaho

appears to strike a reasonable balance Simplot's between mining efforts and the employees,

farmers, communities, and other stakeholders affected by the expansion.

**ORDER**

NOW THEREFORE IT IS HEREBY ORDERED that Plaintiffs' Motion for Summary

Judgment (Docket No. 156) is DENIED.

IT IS FURTHER HEREBY ORDERED that the Federal Defendants' Cross Motion for

Summary Judgment (Docket No. 183) and Simplot's Cross Motion for Summary Judgment

(Docket No. 173) are GRANTED.

DATED: August 4, 2009

Honorable Mikel H. Williams
United States Magistrate Judge